RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0213p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

KENTUCKY WATERWAYS ALLIANCE; SIERRA CLUB,

*Plaintiffs-Appellants*,

*v.*

No. 18-5115

KENTUCKY UTILITIES COMPANY,

*Defendant-Appellee*.

───────────────

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 5:17-cv-00292—Danny C. Reeves, District Judge.

Argued: August 2, 2018

Decided and Filed: September 24, 2018

Before: SUHRHEINRICH, CLAY, and GIBBONS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Thomas Cmar, EARTHJUSTICE, Oak Park, Illinois, for Appellants. Paul D. Clement, KIRKLAND & ELLIS LLP, Washington, D.C., for Appellee. **ON BRIEF:** Thomas Cmar, EARTHJUSTICE, Oak Park, Illinois, Benjamin Locke, EARTHJUSTICE, Philadelphia, Pennsylvania, Joe F. Childers, JOE F. CHILDERS & ASSOCIATES, Lexington, Kentucky, Matthew E. Miller, SIERRA CLUB, Washington, D.C., for Appellants. Paul D. Clement, Erin E. Murphy, KIRKLAND & ELLIS LLP, Washington, D.C., John C. Bender, DINSMORE & SHOHL LLP, Lexington, Kentucky, F. William Brownell, Eric J. Murdock, HUNTON ANDREWS KURTH LLP, Washington, D.C., Robert M. Rolfe, HUNTON ANDREWS KURTH LLP, Richmond, Virginia, Nash E. Long, III, Brent A. Rosser, HUNTON ANDREWS KURTH LLP, Charlotte, North Carolina, J. Gregory Cornett, Robert J. Ehrler, LG&E AND KU ENERGY LLC, Louisville, Kentucky, Sheryl G. Snyder, FROST BROWN TODD LLC, Louisville, Kentucky, for Appellee. Erin M. Palmer, OFFICE OF THE ATTORNEY GENERAL OF ALABAMA, Montgomery, Alabama, Thomas A. Lorenzen, CROWELL & MORING LLP, Washington, D.C., for Amici Curiae.

SUHRHEINRICH, J., delivered the opinion of the court in which GIBBONS, J., joined, and CLAY, J., joined in part.  CLAY, J. (pp. 20–29), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

SUHRHEINRICH, Circuit Judge.  Pollutants can find their way into bodies of water in a variety of ways.  Sometimes they travel by air and settle into lakes, rivers, oceans, and the like.  Sometimes pipes dump pollutants directly into those waters.  In this case, we consider pollution that reaches surface waters by way of subsurface water, or groundwater.

Appellee-Defendant Kentucky Utilities Company ("KU") burns coal to produce energy.  It then stores the leftover coal ash in two man-made ponds.  The plaintiffs here, two environmental conservation groups, contend that the chemicals in the coal ash are contaminating the surrounding groundwater, which in turn contaminates a nearby lake.  They say that this conduct violates two separate federal statutes: the Clean Water Act ("CWA") and the Resource Conservation and Recovery Act ("RCRA").

With their first argument, we disagree.  The CWA does not extend liability to pollution that reaches surface waters via groundwater.  But RCRA does govern this conduct, and because the plaintiffs have met the statutory rigors needed to bring such a claim, the district court must hear it.  We affirm in part and reverse in part.

**I. BACKGROUND**

**A. Statutory Framework**

We are tasked with interpreting two federal statutes in this case: the CWA and RCRA.  As such, some background information on each statute is a helpful starting point.

*CWA.*  Congress passed the CWA in 1972 with the stated purpose of "restor[ing] and maintain[ing] the . . . Nation's waters." 33 U.S.C. § 1251(a).  To promote that goal, the CWA forbids all unpermitted polluting of navigable waters. *Id.* §§ 1311(a), 1342(a).  In that sense, the

statutory scheme is relatively straightforward: get a permit or do not pollute.  Those permits are issued pursuant to the statute's National Pollutant Discharge Elimination System ("NPDES"). *Id.* § 1342.  An NPDES permit is required in order to "discharge . . . any pollutant."  *Id.* § 1311(a).  The discharge of a pollutant is defined as "any addition of any pollutant to navigable waters from any point source."  *Id.* § 1362(12)(A).  Navigable waters are broadly defined as "the waters of the United States."  *Id.* § 1362(7).  And a point source is a "discernible, confined and discrete conveyance."  *Id.* § 1362(14).  Thus, in order to add a pollutant to the waters of the United States via a conveyance, a permit must first be issued.

Congress enacted this program as a major overhaul to the CWA's predecessors, the 1948 Federal Water Pollution Control Act and the Water Quality Act of 1965.  Under those two statutes, liability arose when pollutants in a given body of water exceeded certain levels.  Once excess pollution was detected, enforcement authorities had to trace the pollution back to its source.  Trouble was, tracing those excess levels back to a particular defendant's actions proved all but impossible—only one prosecution was levied under that regime.  *See* S. Rep. No. 92-414 (1971), *as reprinted in* 1972 U.S.C.C.A.N. 3668, 3672 ("The record shows an almost total lack of enforcement.  Under this procedure, only one case has reached the courts in more than two decades.").  To remedy that problem, Congress changed its focus from the receiving water to the discharging source.  *Id.* at 3675 ("Under [the CWA] the basis of pollution prevention and elimination will be the application of effluent limitations.  Water quality will be a measure of program effectiveness and performance, not a means of elimination and enforcement. . . . With effluent limits, the [EPA] . . . need not search for a precise link between pollution and water quality.").

Alongside the CWA's broad proscriptions, Congress also sought to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution [and] to plan the development and use . . . of land and water resources."  33 U.S.C. § 1251(b).  Congress achieved that goal in a few ways.  For example, the CWA allows states to administer the federal NPDES permitting program, provided their regulations are at least as

stringent as the federal limitations.[1] *See id.* § 1342(b)-(d). But perhaps most notably, the CWA draws a line between point-source pollution, as described above, and nonpoint-source pollution. *Id.* § 1362(12), (14). Point-source pollution is subject to the NPDES requirements, and thus, to federal regulation under the CWA. But all other forms of pollution are considered nonpoint-source pollution and are within the regulatory ambit of the states. *See id.* §§ 1314(f), 1362(12); *see also Nat'l Wildlife Fed'n v. Consumers Power Co.*, 862 F.2d 580, 588 (6th Cir. 1988) (noting that, as compared to point-source pollution, "pollution arising from nonpoint sources is to be dealt with differently, specifically through the device of areawide waste treatment management by the states" (quoting *U.S. ex rel. Tenn. Valley Auth. v. Tenn. Water Quality Control Bd.*, 717 F.2d 992, 999 (6th Cir. 1983))). Similarly, federal regulation under the CWA only extends to pollutants discharged into navigable waters, 33 U.S.C. § 1362(12), leaving the states to regulate all pollution of non-navigable waters.

As a means of enforcement, the CWA gives the EPA the power to issue orders and bring civil and criminal actions against those in violation of its provisions. *Id.* § 1319(a)-(c). Moreover, the CWA allows for private citizens to file civil actions against violators, provided they give the EPA, the relevant state, and the alleged wrongdoer sixty-days' notice prior to filing the lawsuit. *Id.* § 1365(a)-(b).

*RCRA.* Enacted four years after the CWA, RCRA is designed to "promote the protection of health and the environment and to conserve valuable material and energy resources." 42 U.S.C. § 6902(a). Like the CWA, RCRA embodies principles of cooperative federalism. The states are central to RCRA's operation, and the federal government "provid[es] technical and financial assistance to State and local governments . . . for the development of solid waste management plans." *Id.* § 6902(a)(1); §6926(b). As the text makes clear, RCRA is concerned with solid waste management, unlike the CWA, which concerns itself with water pollution. As such, the regulatory reach of RCRA begins and ends with solid waste, and the statute expressly excludes "industrial discharges which are point sources subject to [NPDES] permits under [the CWA]." *Id.* § 6903(27). So while coal ash is stored and treated in the coal ash ponds, RCRA

---

[1]Forty-six states, including Kentucky, have taken advantage of this provision and administer the NPDES permitting program. *See* 80 Fed. Reg. 37,054, 37,059 (June 29, 2015).

governs; once the ash pond wastewater is discharged by way of a point source to navigable waters, the CWA kicks in. And when a discharge requires an NPDES permit, it is expressly excluded from RCRA's coverage.

In order to meet its objectives, RCRA encourages states to develop plans to manage solid waste. *Id.* § 6907. Specifically, RCRA requires the EPA to promulgate guidelines for solid waste disposal facilities that would help "protect[] . . . the quality of ground waters and surface waters from leachates." *Id.* § 6907(a)(2).

Similar to the CWA, RCRA allows the EPA and relevant state agencies to enforce the statute via civil or criminal actions. *Id.* § 6928(a), (d), (g), §6926(b). The statute also permits citizen suits. *Id.* § 6972(a). A private citizen may sue "any person . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." *Id.* § 6972(a)(1)(B).[2] In order to bring such a suit, the suing party must provide ninety-days' notice to the EPA, the relevant state, and the alleged wrongdoer. *Id.* § 6972(b)(2)(A).

As part of its rulemaking authority under RCRA, the EPA promulgated a formal rule in 2015 addressing disposal of coal combustion residuals from electric utilities that has been dubbed the "CCR Rule." *See* 80 Fed. Reg. 21,302 (Apr. 17, 2015). The CCR Rule specifically addresses the "disposal of coal [ash] as solid waste under [RCRA]." *Id.* at 21,302. To that end, "[t]he rule requires any existing unlined CCR surface impoundment that is contaminating groundwater above a regulated constituent's groundwater protection standard to stop receiving CCR and either retrofit or close." *Id.* The rule then establishes minimum criteria for coal ash surface impoundments and requires groundwater monitoring, as well as corrective actions where groundwater contamination exceeds accepted levels. *See id.* at 21,396-408; *see also* 40 C.F.R. §§ 257.91, 257.95, 257.98.

---

[2]Under 42 U.S.C. §6972(a)(1)(A), private citizens may also bring a civil action against any party in violation of a RCRA regulation or permit issued under RCRA – a claim plaintiffs did not bring here.

**B. Factual Overview**

KU operates the E.W. Brown Generating Station ("E.W. Brown"). E.W. Brown is a coal-burning power plant in Kentucky. Like all similar power plants, E.W. Brown burns coal in order to heat large amounts of water. The water turns into high-pressure steam and is funneled through pipes to a series of turbines connected to generators. The steam's pressure causes the turbines to spin, which, in turn, causes the generators to produce electricity. The steam passes through the turbines where more water is piped in to cool it and convert it back into condensed water. The condensed water then returns back to the start to repeat this cycle. Just as it sounds, the process uses a lot of water—both for power generation and to cool and condense steam. Water is also used to treat the coal waste generated from this process. As a result, most coal-burning power plants sit near bodies of water from which they draw for their power generation.

E.W. Brown is one such plant. It is located West of Kentucky's Dix River and adjacent to Herrington Lake, which was created by damming a portion of the Dix River. Herrington Lake is a large man-made lake, with a 4.6 square-mile footprint and a 35-mile span. It is a popular recreation destination for Kentucky residents. Since 1957, E.W. Brown has taken water from Herrington Lake in order to generate power for nearby residents.

The problem with burning coal to produce power is that the process also produces ash, or "coal combustion residuals" (commonly referred to as "CCRs"). Two forms of ash are generated by burning coal: (1) light-weight ash known as "fly ash" that is carried through the smokestacks and discharged into the air;[3] and (2) heavier particles known as "bottom ash" that remain at the base of the smokestacks. The bottom ash needs to be removed and disposed of in order to create room for new coal to be burned in the furnaces.

To dispose of coal ash, KU uses a "sluice" system—it combines the ash with lots of water and pipes that wastewater into man-made ponds nearby.[4] Once discharged into those ponds, the ash sinks into the banks and the bottoms of the ponds, where it is intended to remain

---

[3]Fly ash is otherwise regulated and not directly implicated in this lawsuit.

[4]The two ash ponds are designed to discharge wastewater into Herrington Lake (by way of one of its nearby inlets, "Curds Inlet"). Those discharges are covered by NPDES permits and are not the subject of this litigation.

permanently. KU has constructed two ash ponds at E.W. Brown, unceremoniously titled the "Main Ash Pond" and the "Auxiliary Ash Pond." The Main Ash Pond has twice been expanded since it was opened and currently stretches 114 acres. It is estimated to house six million cubic yards of coal ash. The Auxiliary Ash Pond was first constructed as a temporary reservoir while KU expanded the Main Ash Pond. It covers 29.9 acres.

The plaintiffs, two environmental groups: Sierra Club and Kentucky Waterways Alliance (collectively "Plaintiffs"), contend that groundwater flows cause the ash ponds to release pollutants into Herrington Lake.

Some background on groundwater and its flow is necessary. Groundwater is subsurface water that tends to migrate from high elevation to low elevation. Different subsurface materials allow passage of groundwater at different rates and in different volumes. For example, groundwater can hardly flow through clay, whereas it may pass quickly through fractured rock. Those types of terrain that facilitate groundwater movement—like fractured rock—are known as "aquifers," whereas relatively impermeable terrain—like clay—is known as an "aquitard."

Plaintiffs' concern is that the ash ponds are contaminating the nearby groundwater and that this groundwater flows into Herrington Lake, causing excess pollution. The problem is exacerbated, they say, by the fact that the ash ponds sit on top of an aquifer. Specifically, the two ash ponds were built on top of karst terrain. Karst is created when a highly-soluble subsurface rock, often limestone, erodes. This creates a series of caverns, sinkholes, tunnels, and paths. Plaintiffs argue that because the ash ponds sit atop karst terrain, the groundwater flows through it more quickly and more abundantly, thus increasing the rate of pollution into Herrington Lake.

Coal ash can pollute water with a number of different chemicals including, but not limited to, arsenic, lead, calcium, and boron. What caught Plaintiffs' attention in this case was another of those chemicals: selenium. Plaintiffs hired an ecotoxicology expert to test the water near E.W. Brown and he discovered elevated selenium levels in Herrington Lake and in the groundwater surrounding the coal ash ponds. He also found that the fish in Herrington Lake were already being harmed by the selenium levels. While selenium is healthy (indeed,

necessary) in certain small amounts, too much of it can become extremely toxic for fish. Excess selenium accumulates in fish tissue, where it is passed to offspring through a parent's eggs. This can kill developing fish before they hatch or lead to deformities such as misshapen bones once they hatch Those deformities are often lethal. In short, selenium poisoning poses a critical problem for aquatic wildlife.

**C. Regulatory Overview**

In 2011, KU decided to convert its Main Ash Pond into a dry landfill. It submitted its application to do so to the Kentucky Department of Environmental Protection ("KDEP") in August 2011. KDEP required KU to monitor the groundwater surrounding the Main Ash Pond before it would issue a landfill permit. In 2013, KU submitted a report based on its testing that showed increased levels of certain chemicals in nearby areas. After reviewing the report, KDEP issued KU a permit to build the landfill, but it withheld the permit KU needed to operate it. To earn the operation permit, KDEP required KU to submit another plan outlining the actions it planned to take to treat contaminated groundwater and prevent further contamination. KU submitted that plan in February 2015 and, over Plaintiffs' objections, KDEP issued KU an operating permit for the landfill.

Displeased with that outcome, Plaintiffs notified the relevant parties that they intended to sue KU under both the CWA and RCRA. KDEP reviewed Plaintiffs' notice and their corresponding groundwater studies and determined that KU was in violation of its water pollution limits. It issued a Notice of Violation to that effect in January 2017. Kentucky's Energy and Environment Cabinet (the "Cabinet") and KU then entered into an "Agreed Order" in an effort to address the pollution problem. As required by the Agreed Order, KU submitted a "Corrective Action Plan" ("CAP") in April 2017. It outlined extensive monitoring that KU was required to conduct in order to track the progress of the pollution coming from the coal ash ponds. If those studies indicated that the pollution was not improving, the CAP contemplated additional remedial measures.

Unsatisfied, Plaintiffs filed their federal lawsuit in the Eastern District of Kentucky in July 2017. The district court dismissed both of Plaintiffs' claims. First, it rejected Plaintiffs'

legal contention that the CWA covers pollution of this sort.  Second, it held that Plaintiffs lacked standing on their RCRA claim because it could not redress a claim that was already being remedied by Kentucky's regulatory agencies.  Since it concluded that Plaintiffs lacked standing, the district court held that it did not have jurisdiction to hear their claim.

## II.  ANALYSIS

We review the district court's order granting KU's motion to dismiss de novo.  *U.S. Citizens Ass'n v. Sebelius*, 705 F.3d 588, 597 (6th Cir. 2013).  Plaintiffs' complaint may only proceed if it alleges "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### A.  CWA Claim

A CWA claim comes to life when five elements are present: "(1) a *pollutant* must be (2) *added* (3) *to navigable waters* (4) *from* (5) *a point source*." *Consumers Power Co.*, 862 F.2d at 583 (quoting *Nat'l Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 165 (D.C. Cir. 1982)).  In order for groundwater pollution that ultimately affects surface waters to fall within the scope of the CWA, it must fit within those five elements.  Plaintiffs offer two theories as to why their claim does.

First, they argue that groundwater is a point source that deposits pollutants into Herrington Lake.  This theory treats groundwater as if it were a pipe through which pollutants travel.  Plaintiffs also argue that the karst terrain that carries the groundwater is a point source in that it amounts to a network of conduits through which pollutants flow.  We refer to this theory as the "point source" theory.

Next, Plaintiffs adopt the so-called "hydrological connection" theory.[5]  Under this approach, groundwater is not considered a point source, but rather a medium through which

---

[5]This theory has also been referred to as the "conduit" theory.  See, e.g., Damien Schiff, Keeping the Clean Water Act Cooperatively Federal—or, Why the Clean Water Act Does Not Directly Regulate Groundwater Pollution, 42 Wm. & Mary Envtl. L. & Pol'y Rev. 447, 467-68 (2018).

pollutants pass before being discharged into navigable waters.  The point sources under this theory, as Plaintiffs argue, are the coal ash ponds themselves.

We reject both theories; the CWA does not extend its reach to this form of pollution.  The text and statutory context of the CWA make that clear.  In so holding, we disagree with the decisions from our sister circuits in *Upstate Forever v. Kinder Morgan Energy Partners, L.P.*, 887 F.3d 637 (4th Cir. 2018), and *Hawai'i Wildlife Fund v. Cty. of Maui*, 886 F.3d 737 (9th Cir. 2018).[6]

*Text.*  To resolve this issue, the CWA's text is both a helpful starting place and a mandatory one.  *See Mich. Flyer LLC v. Wayne Cty. Airport Auth.*, 860 F.3d 425, 428 (6th Cir. 2017).  As noted, the CWA regulates parties that pollute navigable waters where that pollution comes from a "point source."  33 U.S.C. §§ 1311(a), 1362(12).  A point source, in turn, is a "discernible, confined and discrete conveyance."  *Id.* § 1362(14).  Thus, for pollution to be governed by the CWA, it must have traveled through a conveyance, and that conveyance must have been discernable, confined, and discrete.

Plaintiffs' point source theory fails because neither groundwater nor the karst through which it travels is a point source under these definitions.  While groundwater may indeed be a "conveyance" in that it carries pollutants, *see Convey*, Webster's Third New International Dictionary, Unabridged. 2018.. Web. 21 Aug. 2018 ("[T]o bear from one place to another"; "[T]o transfer or deliver"), it is not "discernible," "confined" or "discrete."  To be discernible, groundwater must be capable of being "recognize[d] or identif[ied] as separate or distinct." *Discern*, Webster's Third New International Dictionary, Unabridged. 2018.. Web. 22 Aug. 2018. Similarly, it must be discrete, meaning it must "constitut[e] a separate entity" or "consist[] of distinct . . . elements," *Discrete*, Webster's Third New International Dictionary, Unabridged. 2018.. Web. 22 Aug. 2018, and it must be confined, meaning "limited to a particular location," *Confined*, Webster's Third New International Dictionary, Unabridged. 2018.. Web. 22 Aug. 2018.  But groundwater is none of those things.  By its very nature, groundwater is a "diffuse

---

[6]The Second Circuit also heard argument on this issue recently.  *26 Crown St. Assocs., LLC v. Greater New Haven Reg'l Water Pollution Control Auth.*, No 17-2426 (2d Cir. Apr. 18, 2018), ECF No. 165.  The court subsequently issued a six-month stay pending settlement talks.  *Id.* at ECF No. 176.

medium" that seeps in all directions, guided only by the general pull of gravity. *See 26 Crown St. Assocs., LLC v. Greater New Haven Reg'l Water Pollution Control Auth.*, No. 3:15-CV-1439, 2017 WL 2960506, at *8 (D. Conn. July 11, 2017). Thus, it is neither confined nor discrete. And while dye traces can roughly and occasionally track the flow of groundwater, they do not render groundwater "discernible." Indeed, Plaintiffs' own expert explained that when he injected dyes into three different locations from the Main Ash Pond in 2012, only one was recovered. One cannot look at groundwater and discern its precise contours as can be done with traditional point sources like pipes, ditches, or tunnels. 33 U.S.C. § 1362(14). For that reason, the CWA's text forecloses an argument that groundwater is a point source.

Plaintiffs' spin-off argument—that the karst underlying the coal ash ponds is a point source—fares no better. They contend that the soluble rock has given way to subsurface conduits and pipes, making the groundwater system discernible, confined, and discrete. But this argument still treats the groundwater system as the point source. All that differs between groundwater in the more traditional sense and groundwater in this case is the terrain through which it passes. As noted, some terrain allows for speedier groundwater flow (like karst); some is less conducive (like clay). The only difference is expediency. That groundwater may move more quickly through karst does not change that it is neither discernable, discrete, nor confined. *See* 33 U.S.C. § 1362(14).[7] Accordingly, the CWA's text does not support the argument that either groundwater or the karst that carries it is a point source.

The CWA's text also forecloses the hydrological connection theory. The backbone of Plaintiffs' argument in favor of the hydrological connection theory is that the relevant CWA provision does not contain the word "directly." Because it only prohibits the discharge of pollutants "to navigable waters from any point source," *id.* § 1362(12)(A), they argue that the CWA allows for pollutants to travel from a point source *through* nonpoint sources en route to navigable waters. The CWA's text suggests otherwise.

First, the guidelines by which a CWA-regulated party must abide—the heart of the CWA's regulatory power—are known as "effluent limitations." *Id.* § 1362(11); §1314(b).

---

[7]Indeed, in Plaintiffs' comments in opposition to KU's landfill permit, they pointed out that karst-related groundwater flows are "unpredictable."

These are caps on the quantities of pollutants that may be discharged from a point source and are prescribed on an industry-by-industry basis. *See id.* § 1314(b). The CWA defines effluent limitations as restrictions on the amount of pollutants that may be "discharged from point sources *into* navigable waters." *Id.* § 1362(11) (emphasis added). The term "into" indicates directness. It refers to a point of *entry*. *See Into*, Webster Third New International Dictionary, Unabridged. 2018.. Web.21 Aug. 2018 ("[E]ntry, introduction, insertion."); *Into*, Oxford English Dictionary (2d ed. 1989) ("Expressing motion to a position within a space or thing: To point within the limits of; to the interior of; *so as to enter*.") (emphasis added). Thus, for a point source to discharge *into* navigable waters, it must dump *directly* into those navigable waters—the phrase "into" leaves no room for intermediary mediums to carry the pollutants.

Moreover, the CWA addresses only pollutants that are added "*to* navigable waters *from* any point source." 33 U.S.C. § 1362(12)(A) (emphasis added). Accordingly, the CWA requires two things in order for pollution to qualify as a "discharge of a pollutant": (1) the pollutant must make its way to a navigable water (2) by virtue of a point-source conveyance. Under the facts of this case, KU is discharging pollutants into the groundwater and the groundwater is adding pollutants to Herrington Lake. But groundwater is not a point source. Thus, when the pollutants are discharged to the lake, they are not coming *from* a point source; they are coming from groundwater, which is a nonpoint-source conveyance. The CWA has no say over that conduct.[8]

---

[8]It bears noting that even if there were some legal basis for the hydrological connection theory, Plaintiffs would still be required to identify a point source. Here, they contend that the coal ash ponds are point sources. We doubt the correctness of that position. A point source, by definition, is a "conveyance." 33 U.S.C. § 1362(14). Coal ash ponds are not conveyances—they do not "take or carry [pollutants] from one place to another." *Convey*, American Heritage Dictionary; *see also Convey*, Merriam-Webster Dictionary ("[T]o bear from one place to another."); *Convey*, Oxford English Dictionary ("To transport, carry, take from one place to another."). In fact, ash ponds are quite the opposite; they are designed to *store* coal ash in place.

The Fourth Circuit recently reached the same conclusion, rejecting Sierra Club's argument that Dominion Energy's landfill and settling ponds served as point sources because they allow arsenic from coal ash to leach into the groundwater and then to navigable waters. *See Sierra Club v. Va. Elec. & Power Co.*, No. 17-1952, --- F.3d ---, 2018 WL 4343513 (4th Cir. Sept. 12, 2018):

> We conclude that while arsenic from the coal ash stored on Dominion's site was found to have reached navigable waters—having been leached from the coal ash by rainwater and groundwater and ultimately carried by groundwater into navigable waters—that simple causal link does not fulfill the Clean Water Act's requirement that the discharge be from a point source. By its carefully defined terms, the Clean Water Act limits its regulation under § 1311(a) to discharges from "*any discernible, confined and discrete conveyance*." 33 U.S.C. § 1362(14) (emphasis added). The definition includes, "but [is] not limited to[,] any pipe, ditch, channel, tunnel,

Often, proponents of the hydrological connection theory turn to *Rapanos v. United States*, 547 U.S. 715 (2006) in support of their position. *See, e.g.*, *Upstate Forever*, 887 F.3d at 650; *Hawai'i Wildlife Fund*, 886 F.3d at 748. In *Rapanos*, the Supreme Court noted that "[t]he [CWA] does not forbid the 'addition of any pollutant *directly* to navigable waters from any point source,' but rather the 'addition of any pollutant *to* navigable waters.'" *Rapanos*, 547 U.S. at 743 (plurality opinion) (quoting 33 U.S.C. § 1362(12)(A)). Plaintiffs rely on this quote in

---

conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft." *Id.*; *see also Consol. Coal Co. v. Costle*, 604 F.2d 239, 249–50 (4th Cir. 1979), *rev'd in part sub nom. EPA v. Nat'l Crushed Stone Ass'n*, 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980) (finding that "discharges which are pumped, siphoned or drained" fall within the definition of discharges from a "point source"); *Appalachian Power*, 545 F.2d at 1373 (concluding that "point source" pollution does not include "unchanneled and uncollected surface waters"). At its core, the Act's definition makes clear that some facility must be involved that functions as a discrete, not generalized, "conveyance."

"Conveyance" is a well-understood term; it requires a channel or medium—i.e., a facility—for the movement of something from one place to another. *See Webster's Third New International Dictionary* 499 (1961); *The American Heritage Dictionary of the English Language* 291–92 (1976); *see also S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 105, 124 S.Ct. 1537, 158 L.Ed.2d 264 (2004) ("[A] point source need not be the original source of the pollutant; it need only convey the pollutant to 'navigable waters' " (emphasis added)). If no such conveyance produces the discharge at issue, the discharge would not be regulated by the Clean Water Act, though it might be by the RCRA, which covers and regulates the storage of solid waste, including coal ash, and its effect on groundwater.

2018 WL 4343513, at *5. The court felt that

[t]his understanding of the Clean Water Act's point-source requirement is consistent with the larger scheme of pollution regulation enacted by Congress. In regulating discharges of pollutants from point sources, Congress clearly intended to target the *measurable* discharge of pollutants. Not only is this revealed by the definitional text of "point source," but it is also manifested in the effluent limitation enforcement scheme that the Clean Water Act employs. The National Pollutant Discharge Elimination System Program and § 1311's enforcement scheme specifically rely on "effluent limitation[s]"—restrictions on the "quantities, rates, and concentrations" of pollutants discharged into navigable waters. 33 U.S.C. § 1362(11) (defining "effluent limitation"). And state-federal permitting programs under the Clean Water Act apply these precise, numeric limitations to discrete outfalls and other "point sources," *see [EPA v. California ex rel. Res. Control Bd.*, 426 U.S. [200,] 205–08 . . . (1976), at which compliance can be readily monitored. When a source works affirmatively to *convey* a pollutant, the concentration of the pollutant and the rate at which it is discharged by that conveyance *can be measured*. But when the alleged discharge is diffuse and not the product of a discrete conveyance, that task is virtually impossible.

*Id.* at *6.

support of their position.  But the quote has been taken out of context in an effort to expand the scope of the CWA well beyond what the *Rapanos* Court envisioned.[9]

The courts and litigants to have relied on *Rapanos* in support of the hydrological connection theory have erred for a number of reasons.  Not the least of which is that *Rapanos* is not binding here: it is a four-justice plurality opinion answering an entirely different legal question.  *See id.* at 739 (concluding that certain wetlands and intermittent streams did not themselves fall within the CWA's definition of navigable waters).  In any event, when Justice Scalia pointed out the absence of the word "directly" from § 1362(12)(A), he did so to explain that pollutants which travel through multiple *point sources* before discharging into navigable waters are still covered by the CWA.  *Id.* at 743 ("[T]he discharge into intermittent channels of any pollutant that naturally washes downstream likely violates [the CWA], even if the pollutants discharged from a point source do not emit 'directly into' covered waters, but pass 'through conveyances' in between." (emphasis omitted)).  Justice Scalia's reference to "conveyances"— the CWA's definition of a point source—reveals his true concern.  He sought to make clear that intermediary point sources do not break the chain of CWA liability; the opinion says nothing of point-source-to-nonpoint-source dumping like that at issue here.  And the facts in *Rapanos* confirm this to be true.  The three wetlands that the Supreme Court defined out of the CWA in *Rapanos* were all linked to navigable waters by multiple different point sources (drains, ditches, creeks, and the like).  *Id.* at 729-30.  Thus, our holding today does not stand in conflict with the *Rapanos* plurality.

*Context.*  This reading is strengthened in light of the CWA's other provisions and corresponding federal environmental laws.  Invariably, courts that have adopted the hydrological connection theory rely heavily on the CWA's stated purpose of "restor[ing] and maintain[ing] . . . the Nation's waters."  33 U.S.C. § 1251(a); *see, e.g.*, *Upstate Forever*, 887 F.3d at 652 (reiterating this purpose and holding that rejecting the hydrological connection theory "would greatly undermine the purpose of the [CWA]"); *Hernandez v. Esso Standard Oil Co.*, 599 F. Supp. 2d 175, 180 (D.P.R. 2009) (adopting the hydrological connection theory on the

---

[9]Indeed, *Rapanos* itself *limited* the scope of the CWA by interpreting the phrase "navigable waters" narrowly.  547 U.S. at 757.

"simple and persuasive" rationale that "since the goal of the CWA is to protect the quality of surface waters, any pollutant which enters such waters, whether directly or through groundwater, is subject to regulation by NPDES permit" (quoting *Wash. Wilderness Coal. v. Hecla Mining Co.*, 870 F. Supp. 983, 990 (E.D. Wash. 1994))). But such outsized reliance on § 1251(a) is misguided.

First, protecting navigable waters is only one of the CWA's expressly stated purposes. Just after declaring its intent to protect the "Nation's waters," the CWA makes clear that it is also designed to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, [and] to plan the development and use . . . of land and water resources." 33 U.S.C. § 1251(b). For that reason, the CWA envisions significant state involvement in environmental regulation. That is why states are authorized to administer the NPDES permitting regime themselves. *Id.* § 1342(b). It is also why the CWA leaves all forms of nonpoint-source pollution to state regulation. *Id.* §§ 1311(a), 1362(12); *see also Consumers Power Co.*, 862 F.2d at 588. Those decisions that base their reasoning on the statute's stated purpose of protecting the nation's waters fail to recognize the CWA's corresponding purpose of fostering cooperative federalism.

Second, turning to a statute's purpose is a "last resort of extravagant interpretation," because Congress does not "pursue[] its purpose at all costs." *Rapanos*, 547 U.S. at 752 (plurality opinion). It is true that Congress sought to protect navigable waters with the CWA. 33 U.S.C. § 1251(a). But it also imposed several textual limitations on the means used to reach that goal. Had it wished to do so, Congress could have prohibited *all* unpermitted discharges of *all* pollutants to *all* waters. But it did not go so far. Instead, Congress chose to prohibit only the discharge of pollutants to "*navigable* waters from any *point source*." 33 U.S.C. § 1362(12)(A) (emphasis added). Thus, Congress did not pursue its stated goal "at all costs," because the CWA precludes federal regulation over non-navigable-water pollution and over nonpoint-source pollution. And the CWA's backdrop illustrates why Congress decided to develop this point-source framework. Under the Federal Water Pollution Control Act and the Water Quality Act (the CWA's predecessors), enforcement failed—federal authorities were unable to trace pollution back to polluters. *See* S. Rep. No. 92-414 (1971), *as reprinted in* 1972 U.S.C.C.A.N.

3668, 3672.  In response, Congress revamped the water pollution laws to focus on polluters (through the point-source requirement), rather than pollution.  It left the rest to the states.

In addition to the CWA's stated purposes, other environmental statutes demonstrate why adopting either of Plaintiffs' theories of liability would be untenable.  Specifically, RCRA is designed to work in tandem with other federal environmental protection laws, including the CWA.  *See* 42 U.S.C. § 6905(b) ("The [EPA] shall integrate all provisions of [RCRA] for purposes of administration and enforcement and shall avoid duplication, to the maximum extent practicable, with the appropriate provisions of . . . [the CWA].").  For that reason, RCRA and the CWA should be read as complementary statutes, each addressed at regulating different potential environmental hazards.  *Cf. Erlenbaugh v. United States*, 409 U.S. 239, 243-44 (1972) (statutes that "pertain to the same subject" may be treated "as if they were one law," because "whenever Congress passes a new statute, it acts aware of all previous statutes on the same subject" (quoting *United States v. Freeman*, 44 U.S. (3 How.) 556, 564 (1845))).

Reading the CWA to cover groundwater pollution like that at issue in this case would upend the existing regulatory framework.  RCRA explicitly exempts from its coverage any pollution that is subject to CWA regulation.  42 U.S.C. § 6903(27).  In that way, RCRA and the CWA are mutually exclusive—if certain conduct is regulated under the CWA and requires an NPDES permit, RCRA does not apply.  Were we to read the CWA to cover KU's conduct here, KU's coal ash treatment and storage practices would be exempted from RCRA's coverage.  But coal ash is solid waste, and RCRA is specifically designed to cover solid waste.  *See id.* § 6902(a)(1).  Reading the CWA so as to remove solid waste management practices from RCRA's coverage is thus problematic.

What is more problematic, though, is the fact that, pursuant to RCRA, the EPA has issued a formal rule that specifically covers coal ash storage and treatment.  *See* 80 Fed. Reg. 21,302 (Apr. 17, 2015) (the "CCR Rule").  The CCR Rule was designed to regulate, among other things, coal ash ponds.  *Id.* at 21,303.  Yet because the EPA issued the CCR Rule under RCRA, reading the CWA to cover coal ash ponds would gut the rule.  Adopting Plaintiffs' reading of the CWA would mean that any coal ash pond with a hydrological connection to a navigable water would require an NPDES permit, thus removing it from RCRA's coverage and, with it, the CCR Rule.

Almost all coal ash ponds sit near navigable waterways because of the large amounts of water needed to operate coal-fired power plants. For this reason, adopting Plaintiffs' interpretation of the CWA would leave the CCR Rule virtually useless. We decline to interpret the CWA in a way that would effectively nullify the CCR Rule and large portions of RCRA. *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (quoting 2A N. Singer, Statutes and Statutory Construction § 46.06, 181-86 (rev. 6th ed. 2000))).

Our task is "not merely [to find] a reasonable interpretation, but the best one." *United States v. Zabawa*, 719 F.3d 555, 560 (6th Cir. 2013). Reading the CWA to extend liability to groundwater pollution is not the best one. For that reason, we reject both of Plaintiffs' theories of liability and affirm the district court's dismissal.[10]

## B. RCRA Claim

As discussed, the proper federal channel for Plaintiffs' complaint is RCRA. Fortunately for Plaintiffs, their complaint also alleges a RCRA violation. But unfortunately for them, the district court concluded that it lacked jurisdiction to hear that claim. Its reasoning was straightforward—it believed that the state had already implemented a plan designed to address the conduct about which Plaintiffs complained and thus it could not issue separate relief. In other words, the district court perceived that it could not redress the Plaintiffs' problems. Without a redressable claim, Plaintiffs lacked Article III standing, and the district court lacked jurisdiction. On appeal, KU urges us to affirm either because the district court lacked jurisdiction or because abstention was proper.

The motivation behind the district court's decision was sound: states are typically left to regulate their own environments and federal environmental regulatory statutes typically make

---

[10]While we do not rely on it in reaching this conclusion, the CWA's legislative history suggests that Congress was at least aware of the connection between groundwater and surface water pollution but nevertheless chose not to regulate groundwater directly. In support of a CWA amendment which would directly regulate groundwater, Representative Aspin noted: "If we do not stop pollution of ground waters through seepage and other means, ground water gets into navigable waters, and to control only navigable water and not ground water makes no sense at all." 118 Cong. Rec. 10,666 (1972) (remarks of Rep. Aspin). The House rejected that amendment. 118 Cong. Rec. 10,669 (1972). The Senate rejected several similar amendments. *See* S. Rep. No. 92-414 (1971), *as reprinted in* 1972 U.S.C.C.A.N. 3668, 3739.

room for state regulation.  *See, e.g.*, 42 U.S.C. § 6902(a)(7) (one of RCRA's purposes is to create a "Federal-State partnership" wherein the EPA will "give a high priority to assisting and cooperating with States in obtaining full authorization of State programs"), §6926(b).  Since Kentucky was regulating the challenged conduct under Kentucky law (albeit administratively), *see* Ky. Rev. Stat. § 224.70-110, the federal district court felt it was inappropriate to intervene.  While we recognize that concern, the district court erred in concluding that it lacked jurisdiction because of it.

Plaintiffs filed their RCRA suit under 42 U.S.C. § 6972(a)(1)(B).  To bring a claim under that section, a plaintiff must allege that a defendant's conduct presents "an imminent and substantial endangerment to health or the environment."  *Id.*  A number of procedural requirements also apply to a citizen suit under § 6972(a)(1)(B).  The plaintiff must notify the EPA, the relevant state, and the alleged wrongdoer at least ninety days before filing suit.  *Id.* § 6972(b)(2)(A).  This gives the EPA and the state the opportunity to respond to the problem before allowing the citizen suit to commence.  And if the state or EPA takes action in one of three statutorily prescribed ways, a citizen is barred from pursuing a RCRA citizen suit.  *Id.* § 6972(b)(2)(C) (the "diligent prosecution bar").  Provided a plaintiff meets RCRA's procedural requirements and the EPA or state does not take action, the citizen suit can proceed.

Here, Plaintiffs have met the strictures of RCRA's citizen-suit provision.  They have alleged (and supported) an imminent and substantial threat to the environment they have provided the EPA and Kentucky ninety days to respond to those allegations, and neither the EPA nor Kentucky has filed one of the three types of actions that would preclude the citizen groups from proceeding with their federal lawsuit, *see id*.  Thus, the district court had jurisdiction to hear Plaintiffs' RCRA claim and erred in holding otherwise.

As the district court recognized, this case looks like a strong contender for *Burford* abstention at first glance.  *See Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).  *Burford* instructs federal courts to avoid hearing cases where doing so would interfere with a state's regulatory efforts.  *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989).  Here, Kentucky is actively regulating the problems Plaintiffs are worried about through the Agreed Order, and *Burford* might counsel federal courts against second-guessing the State's

decisions on that score. But applying *Burford* abstention here would be akin to grafting a new provision onto RCRA's diligent prosecution bar. Were we to abstain, we would effectively add a new component to that bar precluding citizen suits where a state is already trying to remedy the problem, regardless of the regulatory mechanism it is using. *See, e.g.*, *Chico Serv. Station, Inc. v. Sol Puerto Rico Ltd.*, 633 F.3d 20, 31 (1st Cir. 2011) ("To abstain in situations other than those identified in the statute . . . threatens an 'end run around RCRA.'" (quoting *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 619 (7th Cir. 1998))). Doing so would substitute our own judgment about the appropriate balance of state and federal interests for the *ex-ante* determination that Congress made regarding this balance when it enacted RCRA. *See* 42 U.S.C. § 6972(b)(2)(A)–(F); *Chico Serv. Station, Inc.*, 633 F.3d at 31. We cannot endorse such an approach.

Because Plaintiffs have met the requirements needed to pursue a RCRA citizen suit, and because *Burford* abstention is inappropriate where Congress has already considered which state actions should preclude federal intervention, the district court erred in holding that it lacked jurisdiction. The federal courts have jurisdiction over this RCRA claim and thus they must exercise it. *See Colo. River Watch Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them"). Accordingly, we reverse the district court's dismissal of Plaintiffs' RCRA suit for want of jurisdiction and remand for further proceedings.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's dismissal of Plaintiffs' CWA suit. The CWA does not impose liability on surface water pollution that comes by way of groundwater. However, we REVERSE the district court's dismissal of Plaintiffs' RCRA claim. Plaintiffs have met the statutory requirements to bring that suit, and the district court must entertain it. The case is REMANDED for further proceedings on that claim.

---

## CONCURRING IN PART AND DISSENTING IN PART

---

CLAY, Circuit Judge, concurring in part and dissenting in part. Can a polluter escape liability under the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251–1387, by moving its drainage pipes a few feet from the riverbank? The Fourth and Ninth Circuits have said no. In two cases today,[1] the majority says yes. Because the majority's conclusion is contrary to the plain text and history of the CWA, I respectfully dissent from the majority's conclusion that Plaintiffs' CWA claim was properly dismissed. Meanwhile, I concur in the majority's determination that the district court erred by dismissing Plaintiffs' claim under the Resource Conservation and Recovery Act ("RCRA").

Plaintiffs have invoked the citizen-suit provision of the CWA, which provides that "any citizen may commence a civil action . . . against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation under this chapter[.]" 33 U.S.C. § 1365(a). "For purposes of this section, the term 'effluent standard or limitation under this chapter' means," among other possibilities, "an unlawful act under subsection (a) of section 1311 of this title." § 1365(f). In turn, § 1311(a) prohibits "the discharge of any pollutant by any person[.]"

The broad sweep of a defendant's potential CWA liability is limited in two ways. First, Congress included a list of exceptions in § 1311(a) itself: the discharge of a pollutant is unlawful "[e]xcept in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title." Second, Congress gave the phrase "discharge of a pollutant" a very specific definition: it means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A). Taken together, Congress thus authorized citizen suits to prevent the "addition of any pollutant to navigable waters from any point source," *see* § 1362(12)(A), but if a listed statutory exception applies, *see* § 1311(a).

The majority argues that this standard cannot be satisfied when, as here, pollution travels briefly through groundwater before reaching a navigable water. Plaintiffs counter that such an

---

[1]The other case is Case No. 17-6155, *Tennessee Clean Water Network v. Tennessee Valley Authority*.

exception has no statutory basis and would allow polluters to shirk their CWA obligations by placing their underground drainage pipes a few feet away from the shoreline. This case could have profound implications for those in this Circuit who would pollute our Nation's waters. And the issue is novel. This Court has never before considered whether the CWA applies in this context.

However, the Fourth and Ninth Circuits have. Both courts determined that a short journey through groundwater does not defeat CWA liability. *See Upstate Forever v. Kinder Morgan Energy Partners, L.P.*, 887 F.3d 637, 649–51 (4th Cir. 2018); *Hawai'i Wildlife Fund v. Cty. of Maui*, 886 F.3d 737, 745–49 (9th Cir. 2018). The Second Circuit reached a similar conclusion where the pollutants traveled briefly through fields (which are not necessarily point sources) and through the air. *See Concerned Area Residents for Env't v. Southview Farm*, 34 F.3d 114, 118–19 (2d Cir. 1994) (fields); *Peconic Baykeeper, Inc. v. Suffolk Cty.*, 600 F.3d 180, 188–89 (2d Cir. 2010) (air). Until today, no Circuit had come out the other way. The reason is simple: the CWA does not require a plaintiff to show that a defendant discharged a pollutant from a point source *directly* into navigable waters; a plaintiff must simply show that the defendant "add[ed] . . . any pollutant *to* navigable waters *from* any point source." *See* §§ 1362(12)(A) (emphases added), 1365(a), 1311(a); *Upstate Forever*, 887 F.3d at 650; *Hawai'i Wildlife Fund*, 886 F.3d at 749.

The Supreme Court addressed this precise issue in *Rapanos v. United States*, 547 U.S. 715 (2006). There, Justice Scalia's plurality opinion was explicit:

> The Act does not forbid the "addition of any pollutant *directly* to navigable waters from any point source," but rather the "addition of any pollutant *to* navigable waters." [33 U.S.C.] § 1362(12)(A) (emphasis added); § 1311(a). Thus, from the time of the CWA's enactment, lower courts have held that the discharge into intermittent channels of any pollutant *that naturally washes downstream* likely violates § 1311(a), even if the pollutants discharged from a point source do not emit "directly into" covered waters, but pass "through conveyances" in between. *United States v. Velsicol Chemical Corp.*, 438 F. Supp. 945, 946–947 (W.D.Tenn. 1976) (a municipal sewer system separated the "point source" and covered navigable waters). See also *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1137, 1141 (C.A.10 2005) (2.5 miles of tunnel separated the "point source" and "navigable waters").

*Id.* at 743 (plurality opinion) (emphasis in original).  True, Justice Scalia's plurality opinion is not binding.  But no Justice challenged this aspect of the opinion, and for good reason:  the statutory text unambiguously supports it.

Further, applying the CWA to point-source pollution traveling briefly through groundwater before reaching a navigable water promotes the CWA's primary purpose, which is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  By contrast, the majority's approach defeats the CWA's purpose by opening a gaping regulatory loophole: polluters can avoid CWA liability by discharging their pollutants into groundwater, even if that groundwater flows immediately into a nearby navigable water.  This exception has no textual or logical foundation.  As one district court observed,

> it would hardly make sense for the CWA to encompass a polluter who discharges pollutants via a pipe running from the factory directly to the riverbank, but not a polluter who dumps the same pollutants into a man-made settling basin some distance short of the river and then allows the pollutants to seep into the river via the groundwater.

*See N. Cal. River Watch v. Mercer Fraser Co.*, No. C-04-4620 SC, 2005 WL 2122052, at *2 (N.D. Cal. Sept. 1, 2005).  In addition, this exception has no apparent limits.  Based on the majority's logic, polluters are free to add pollutants to navigable waters so long as the pollutants travel through any kind of intermediate medium—for example through groundwater, across fields, or through the air.  This would seem to give polluters free rein to discharge pollutants from a sprinkler system suspended above Lake Michigan.  After all, pollutants launched from such a sprinkler system would travel "in all directions, guided only by the general pull of gravity." *See* Maj. Op. at 11.  According to the majority, this would defeat CWA liability.[2]

---

[2]The majority declines to reverse the district court's other finding that a coal ash pond is a point source under the CWA, but suggests disagreement in a footnote.  The CWA defines "point source" as "any discernible, confined and discrete conveyance," including "any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).  The majority cites a recent Fourth Circuit case, *Sierra Club v. Va. Elec. & Power Co.*, No. 17-1952, --- F.3d ---, 2018 WL 4343513 (4th Cir. Sept. 12, 2018), which held that a coal ash pond is not a point source because it was a "static recipient[] of the precipitation and groundwater that flowed through [it]." 2018 WL 4343513 at *6.  Looking at the text of the CWA, however, shows that, *inter alia*, "ditch[es], well[s], container[s]," and "vessel[s]" are included in the definition. 33 U.S.C. § 1362(14).  The canon of *ejusdem generis* states that "the general term must take its meaning from the specific terms with which it appears." *Retail Ventures, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 691 F.3d 821, 833 (6th Cir. 2012).  The common

I have a very different view.  In cases where, as here, a plaintiff alleges that a defendant is polluting navigable waters through a complex pathway, the court should require the plaintiff to prove the existence of pollutants in the navigable waters and to persuade the factfinder that the defendant's point source is to blame—that the defendant is unlawfully "add[ing] . . . any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12)(A).  The more complex the pathway, the more difficult the proof.  Where these cases are plausibly pleaded, they should be decided on the facts.

Instead, the majority holds that a plaintiff may never—as a matter of law—prove that a defendant has unlawfully added pollutants to navigable waterways via groundwater.  For its textual argument, the majority refers us to the term "effluent limitations."  This term, the majority says, is defined as "restrictions on the amount of pollutants that may be 'discharged from point sources *into* navigable waters.'"  Maj. Op. at 12 (quoting with emphasis 3 U.S.C. § 1362(11)).  Seizing on the word "into"—which denotes "entry, introduction, insertion"—the majority concludes that the effluent-limitation definition implicitly creates an element of "directness."  In other words, the majority reasons, "for a point source to discharge *into* navigable waters, it must dump *directly* into those navigable waters[.]" *Id.* (emphasis in original).

---

denominator between wells, containers, ditches, and vessels is that each is a man-made, defined area where liquid collects.  The canon of *ejusdem generis* thus suggests that man-made coal ash ponds are included in this definition.  The Fourth Circuit instead cites a dictionary definition of "conveyance" as "a facility—for the movement of something from one place to another" without explaining how items like wells, containers, and vessels fit this definition.  *Va. Elec. & Power Co.*, 2018 WL 4343513, at *5 (quoting *Webster's Third New International Dictionary* 499 (1961)).  The Fourth Circuit suggests that a container can be a point source only if it is in the act of conveying something, 2018 WL 4343513, at *7, ignoring that the statutory definition includes "*any* … container … from which pollutants are or may be discharged."  33 U.S.C. § 1362(14) (emphasis added).

The Fourth Circuit's approach is further misguided in that it conflicts with the broad interpretation that federal courts have traditionally given to the phrase "point source."  *See, e.g.*, *Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 219 (2d Cir. 2009) (quoting *Dague v. City of Burlington,* 935 F.2d 1343, 1354–55 (2d Cir. 1991), *rev'd on other grounds*, 505 U.S. 557 (1992)) ("[T]he definition of a point source is to be broadly interpreted."); *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 955 (9th Cir. 2002) (quoting *Dague,* 935 F.2d at 1354–55); *Cmty. Ass'n for Restoration of Env't (CARE) v. Sid Koopman Dairy*, 54 F. Supp. 2d 976, 980 (E.D. Wash. 1999) (citing *Dague,* 935 F.2d at 1354–55); *Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC*, 141 F. Supp. 3d 428, 444 (M.D. N.C. 2015) (quoting *Dague,* 935 F.2d at 1354–55); *see United States v. Earth Scis., Inc.*, 599 F.2d 368, 373 (10th Cir. 1979) ("[T]he concept of a point source was designed to further [the CWA's regulatory] scheme by embracing the broadest possible definition of any identifiable conveyance from which pollutants might enter the waters of the United States.").  By embracing a restrictive definition of what constitutes a point source, the Fourth Circuit jettisons these long-standing principles.

The majority is way off the rails.  First of all, "Congress 'does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.'"  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1626–27 (2018) (quoting *Whitman v. Am. Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001)).  The majority should heed this commonsense advice.  Congress did not hide a massive regulatory loophole in its use of the word "into."

But more importantly, the majority's quoted definition of "effluent limitation" from § 1362(11)—the supposed origin of the loophole—is not relevant to this case.  The citizen-suit provision uses the term "effluent standard or limitation"—not the term "effluent limitation."  *See* 33 U.S.C. § 1365(f).  As the majority itself argues, minor distinctions in statutory language sometimes matter.  This one does.  The phrase "effluent standard or limitation" is a term of art and is wholly distinct from the term "effluent limitation."  This conclusion is supported not by tea leaves or a carefully selected dictionary, but rather by the CWA itself.  The citizen-suit provision of the CWA provides that "effluent standard or limitation" means, among other things, "an unlawful act under subsection (a) of section 1311 of this title."  33 U.S.C. § 1365(a).  Turning to § 1311(a), we find that, absent certain exceptions, "the discharge of any pollutant by any person shall be unlawful," § 1311(a), and the "discharge of a pollutant" means "any addition of any pollutant *to* navigable waters from any point source," § 1362(12)(A) (emphasis added).  Thus, even assuming the majority correctly parses the definition of "into"—a dubious proposition at best—the word "into" is not contained in any of the statutory provisions at issue.  Rather, we find the word "to," which does not even arguably suggest a requirement of directness; the word "to" merely "indicate[s] movement or an action or condition suggestive of movement toward a place, person, or thing reached."  *To*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/to.

It is therefore entirely unclear why the majority relies on the definition of "effluent limitation."  That definition is simply irrelevant to this lawsuit.  As a result, the majority's criticisms of the approach taken by the Fourth and Ninth Circuits miss the mark.  Indeed, the Fourth Circuit analyzed the correct statutory text when it rejected the argument that the citizen-suit provision requires directness:

> [t]he plain language of the CWA requires only that a discharge come "from" a "point source." *See* 33 U.S.C. § 1362(12)(A). Just as the CWA's definition of a discharge of a pollutant does not require a discharge directly to navigable waters, *Rapanos*, 547 U.S. at 743, 126 S.Ct. 2208, neither does the Act require a discharge directly from a point source, *see* 33 U.S.C. § 1362(12)(A). The word "from" indicates "a starting point: as (1) a point or place where an actual physical movement . . . *has its beginning*." Webster's Third New International Dictionary 913 (Philip Babcock Gove et al. eds., 2002) (emphasis added); *see also* The American Heritage Dictionary of the English Language 729 (3d ed. 1992) (noting "from" indicates a "starting point" or "cause"). Under this plain meaning, a point source is the starting point or cause of a discharge under the CWA, but that starting point need not also convey the discharge directly to navigable waters.

*Upstate Forever*, 887 F.3d at 650 (footnote omitted). In short, if the majority would like to add a "directness" requirement to § 1311, it must fight the statutory text to get there.

In addition, the majority fails to meaningfully distinguish Justice Scalia's concurrence in *Rapanos*, which made clear that the CWA applies to indirect pollution. It is true that *Rapanos* dealt with different facts. But it is irrelevant that the pollution in *Rapanos* traveled through point sources before reaching a navigable water, whereas the pollution in this case allegedly traveled through groundwater, which, according to the majority, is not a point source. In both cases, the legal issue is the same: whether the CWA applies to pollution that travels from a point source to navigable waters through a complex pathway. *See Rapanos*, 547 U.S. at 745 (asking whether "the contaminant-laden waters ultimately reach covered waters"). Indeed, Justice Scalia favorably cited the Second Circuit's discussion in *Concerned Area Residents for the Environment*. *Rapanos*, 547 U.S. at 744. In that case, pollutants traveled across fields—which "were not necessarily point sources themselves"—before reaching navigable waters. *Hawai'i Wildlife Fund*, 886 F.3d at 748. Given the Supreme Court plurality's endorsement of the Second Circuit's approach, the majority's attempt to distinguish *Rapanos* collapses.

Next, the majority warns that imposing liability would upset the cooperative federalism embodied by the CWA. On this view, the states alone are responsible for regulating pollution of groundwater, even if that pollution later travels to a navigable water. Wrong again. To be sure, the CWA recognizes the "primary responsibilities and rights of States" to regulate groundwater pollution. 33 U.S.C. § 1251(b). But imposing liability in this case would not marginalize the states. To the contrary, the district court in today's companion case made clear that disputes like

this one do *not* involve regulating groundwater. *See Tennessee Clean Water Network*, 273 F. Supp. 3d at 826 ("The Court agrees with those courts that view the issue not as whether the CWA regulates the discharge of pollutants into groundwater itself but rather whether the CWA regulates the discharge of pollutants to navigable waters via groundwater." (quotation marks, alteration, and citation omitted)). Instead, the district court explained that the issue is the regulation of navigable water *via* groundwater. *Id.* This distinction was also clear to the Fourth and Ninth Circuits. *See Upstate Forever*, 887 F.3d at 652 ("We do not hold that the CWA covers discharges to ground water itself. Instead, we hold only that an alleged discharge of pollutants, reaching navigable waters . . . by means of ground water with a direct hydrological connection to such navigable waters, falls within the scope of the CWA."); *Hawai'i Wildlife Fund*, 886 F.3d at 749 ("[T]he County's concessions conclusively establish that pollutants discharged from all four wells emerged at discrete points in the Pacific Ocean . . . . We leave for another day the task of determining when, if ever, the connection between a point source and a navigable water is too tenuous to support liability under the CWA."). Accordingly, if Plaintiffs successfully prove the allegations in their complaint, imposing liability in this case would fit perfectly with the CWA's stated purpose: to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

Finally, the majority offers a narrow reading of the CWA because, in its view, a more inclusive reading would render "virtually useless" the Coal Combustion Residuals ("CCR") Rule under RCRA. Maj. Op. at 17. The majority notes that if a polluter's conduct is regulated through a CWA permit, then RCRA does not also apply. The majority therefore suggests that a straightforward reading of the CWA is incompatible with RCRA. The majority would gut the former statute to save the latter.

But the EPA has already dismissed the majority's concern. Indeed, the EPA issued federal regulations on this issue many decades ago. The EPA's interpretation is that the industrial discharge of waste such as CCR is subject to regulation under both RCRA and the CWA: RCRA regulates the way polluters store CCR, and the CWA kicks in the moment CCR enters a navigable waterway. *See* 40 C.F.R. § 261.4(a)(2). The EPA first articulated this approach in a set of regulations from 1980, which provide that "[i]ndustrial wastewater

discharges that are point source discharges subject to regulation under section 402 of the Clean Water Act" "are not solid wastes for the purpose of" the RCRA exclusion. 40 C.F.R. § 261.4(a)(2). This exclusion, the regulation explains, "applies only to the *actual point source discharge*. It does not exclude industrial wastewaters while they are being collected, stored or treated before discharge, nor does it exclude sludges that are generated by industrial wastewater treatment." § 261.4(a)(2) (comment) (emphasis added). Thus, under the EPA's reading, a polluter can be liable under RCRA for improperly storing CCR—even if the CCR never enters a navigable waterway. *See id.* Conversely, a polluter can be liable under the CWA for adding CCR to a navigable waterway—even if the polluter's storage methods comport with RCRA. *See id.* And of course, a polluter can be liable under both statutes if the polluter both improperly stores CCR and discharges it to a navigable waterway. *See id.*

The EPA settled any doubts on this matter by publishing a detailed description of its rationale in the Federal Register. *See* 45 Fed. Reg. 33098. The EPA explained that 40 C.F.R. § 261.4(a)(2) reflects the EPA's interpretation that regulation of a polluter's discharge of industrial waste to a navigable waterway pursuant to the CWA does *not* trigger the 42 U.S.C. § 6903(27) exclusion and therefore does *not* exempt that polluter's storage of CCR from regulation under RCRA:

> The obvious purpose of the industrial point source discharge exclusion in Section 1004(27) was to avoid duplicative regulation of point source discharges under RCRA and the Clean Water Act. Without such a provision, the discharge of wastewater into navigable waters would be "disposal" of solid waste, and potentially subject to regulation under both the Clean Water Act and Subtitle C [of RCRA]. These considerations do not apply to industrial wastewaters prior to discharge since most of the environmental hazards posed by wastewaters in treatment and holding facilities—primarily groundwater contamination—cannot be controlled under the Clean Water Act or other EPA statutes.
>
> Had Congress intended to exempt industrial wastewaters in storage and treatment facilities from all RCRA requirements, it seems unlikely that the House Report on RCRA would have cited, as justification for the development of a national hazardous waste management program, numerous damage incidents which appear to have involved leakage or overflow from industrial wastewater impoundments. *See, e.g.*, H.R. Rep. at 21. Nor would Congress have used the term "discharge" in Section 1004(27). This is a term of art under the Clean Water Act (Section 504(12)) and refers only to the "addition of any pollutant to navigable waters", not to industrial wastewaters prior to and during treatment.

> Since the comment period closed on EPA's regulations, both Houses of Congress have passed amendments to RCRA which are designed to provide EPA with more flexibility under Subtitle C in setting standards for and issuing permits to existing facilities which treat or store hazardous wastewater. *See* Section 3(a)(2) of H.R. 3994 and Section 7 of S.1156. *See also* S. Rep. No. 96-173, 96th Cong., 1st Sess. 3 (1979); Cong. Rec. S6819, June 4, 1979 (daily ed.); Cong. Rec. H1094–1096, February 20, 1980 (daily ed.). These proposed amendments and the accompanying legislative history should lay to rest any question of whether Congress intended industrial wastewaters in holding or treatment facilities to be regulated as "solid waste" under RCRA.

45 Fed. Reg. 33098. Congress ratified the EPA's interpretation when it enacted amendments to RCRA, which the EPA said would "lay to rest" any concerns about whether industrial wastes like CCR are subject to regulation under both RCRA (in terms of their storage and treatment) and the CWA (in terms of their discharge to navigable waters). *Id.*; *see* Public Law 96-482. From this history, and from the text of the statutes, we can surmise that Congress intended to delegate to the EPA the power "to speak with the force of law" on this aspect of the interplay between RCRA and the CWA. *See United States v. Mead Corp.*, 533 U.S. 218, 229 (2001). Exercising this authority, the EPA reached an interpretation that is different from—and incompatible with—that of the majority.

Contravening bedrock principles of administrative law, the majority bulldozes the EPA's interpretation of its own statutory authority without even discussing the possibility of deference. But "[w]e have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984).

> In *Chevron*, this Court held that ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion. Filling these gaps, the Court explained, involves difficult policy choices that agencies are better equipped to make than courts. 467 U.S., at 865–866, 104 S.Ct. 2778. If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation.

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005). The EPA says that imposing CWA liability for the discharge of CCR to navigable waterways does not eliminate the possibility of RCRA liability for the storage and treatment of CCR. The majority suggests the exact opposite. Unfortunately for the majority, but fortunately for those who enjoy clean water, the majority lacks the authority to override longstanding EPA regulations on a whim. *See id.*

For all these reasons, I believe the CWA clearly applies to the allegations in this case. Accordingly, I would join our sister circuits in holding that the CWA prohibits all pollution that reaches navigable waters "by means of ground water with a direct hydrological connection to such navigable waters[.]" *Upstate Forever*, 887 F.3d at 652; *see Hawai'i Wildlife Fund*, 886 F.3d at 745–49. Under this standard, Plaintiffs have stated a valid claim that Kentucky Utility Company's unpermitted leaks are unlawful. Because the majority holds otherwise, I respectfully dissent in part. I agree with the majority's opinion only insofar as the majority finds that the district court erred by dismissing Plaintiffs' RCRA claim.