NIEMEYER, Circuit Judge:
For over 60 years, Virginia Electric & Power Company, d/b/a Dominion Energy Virginia ("Dominion"), operated a coal-fired power plant in Chesapeake, Virginia, that produced coal ash as a by-product of the coal combustion. Pursuant to permits issued by the Virginia Department of Environmental Quality ("VDEQ") under the *406 Clean Water Act and the Resource Conservation and Recovery Act, Dominion stored the coal ash on site in a landfill and in settling ponds.
Through groundwater monitoring that was required by the VDEQ permits, Dominion began in 2002 to detect arsenic in the groundwater at levels that exceeded Virginia's groundwater quality standards. Arsenic leaches from coal ash when water passes through it. As required, Dominion notified the VDEQ and began developing and implementing a corrective action plan with the VDEQ to mitigate the pollution. The VDEQ approved the plan in 2008. In 2014, Dominion closed its Chesapeake plant and began making arrangements with the VDEQ to close the landfill and settling ponds.
In March 2015, Sierra Club commenced this action against Dominion under the citizen-suit provision of the Clean Water Act, alleging that Dominion was violating 33 U.S.C. § 1311(a), which prohibits the unauthorized "discharge of any pollutant" into navigable waters. Under the Act, the discharge of a pollutant is defined to mean the "addition of any pollutant to navigable waters from any point source." Id . § 1362(12). According to Sierra Club's complaint, the landfill and settling ponds qualified as point sources from which arsenic seeped, polluting the groundwater around Dominion's plant and ultimately the navigable waters of the nearby Elizabeth River and Deep Creek. Based on these same allegations, Sierra Club also claimed that Dominion was violating two conditions of its Clean Water Act discharge permit.
Following a bench trial, the district court found that rainwater and groundwater were indeed leaching arsenic from the coal ash in the landfill and settling ponds, polluting the groundwater, which carried the arsenic into navigable waters. And because the court determined that the landfill and settling ponds constituted "point sources" as defined by the Act, it found Dominion liable for ongoing violations of § 1311(a). The court, however, deferred to the VDEQ's understanding that the two conditions in Dominion's discharge permit identified in Sierra Club's complaint did not cover the groundwater contamination at issue and ruled against Sierra Club on the claims alleging breach of those conditions. Dominion appealed, and Sierra Club cross-appealed.
Because we conclude that the landfill and settling ponds on the Chesapeake site do not constitute "point sources" as that term is defined in the Clean Water Act, we reverse the district court's ruling that Dominion was liable under § 1311(a) of the Act. We agree, however, with the district court's conclusion that the conditions in Dominion's discharge permit did not regulate the groundwater contamination at issue and affirm on those claims.
I
The Clean Water Act was enacted in 1972 with the stated objective "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To those ends, the Act prohibits the "discharge of any pollutant by any person" into navigable waters unless otherwise authorized by the Act. Id . § 1311(a). The "discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source." Id . § 1362(12). And "point source" is defined as "any discernible, confined and discrete conveyance ... from which pollutants are or may be discharged." Id . § 1362(14). Accordingly, the addition of pollutants to navigable waters from nonpoint sources does not violate § 1311(a). See Appalachian Power Co. v. Train , 545 F.2d 1351, 1373 (4th Cir. 1976) ("Congress consciously distinguished between *407 point source and nonpoint source discharges, giving EPA authority under the [Clean Water] Act to regulate only the former").
As recognized in § 1311(a), the Act does provide for the issuance of permits authorizing the discharge of pollutants into navigable waters in compliance with specified effluent standards. In 50 U.S.C. § 1342(a), the Act established the National Pollutant Discharge Elimination System, under which the EPA may "issue a permit for the discharge of any pollutant" provided that the authorized discharge complies with the effluent standards specified in the permit or otherwise imposed by the Act. Through that System, the EPA also shares regulatory authority with the States, and a State can elect to establish its own permit program, subject to the EPA's approval. Id . § 1342(b)-(c); see EPA v. California ex rel. State Water Res. Control Bd ., 426 U.S. 200, 205-08, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976). When a State elects to establish its own program, the EPA suspends its federal permit program and defers to the State's, allowing the state discharge permit to authorize effluent discharges under both state and federal law.
While § 1311(a) 's prohibitive scope is limited to the discharge of pollutants from point sources, pollution from the storage of solid waste, such as coal ash, is regulated by the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et. seq. The RCRA "is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." Meghrig v. KFC Western, Inc. , 516 U.S. 479, 483, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996). The Act distinguishes between hazardous and nonhazardous solid waste, and although hazardous waste facilities are subject to direct federal oversight, the nonhazardous waste facilities, such as those created to store coal ash, remain "primarily the function of State, regional, and local agencies" with the "financial and technical assistance and leadership" of federal authorities. 42 U.S.C. § 6901(a)(4). Nonetheless, the EPA has specifically promulgated "minimum national criteria" governing the design, management, and closure of facilities storing coal combustion residuals like coal ash. See 40 C.F.R. §§ 257.50 - 257.107. These facilities are required to obtain a permit either directly from the EPA or from an EPA-approved state program that mandates compliance with the minimum national criteria, as well as any other conditions imposed by the issuing state agency. 42 U.S.C. § 6945(d).
Virginia has elected to implement permitting programs under both the Clean Water Act and the RCRA. The VDEQ administers an EPA-approved program under the Clean Water Act for the issuance of permits covering the "[d]ischarge into state waters [of] sewage, industrial wastes, other wastes, or any noxious or deleterious substances." Va. Code Ann. § 62.1-44.5. And it administers a program under the RCRA regulating the storage, treatment, and disposal of solid waste through its Waste Management Act, Va. Code Ann. § 10.1-1400 et. seq . Operators of landfills or other facilities for the storage or treatment of coal combustion residuals must obtain a permit from the VDEQ that incorporates existing EPA regulations, including the minimum national criteria for coal ash sites. See Va. Code Ann. § 10.1-1408.1 ; 9 Va. Admin. Code §§ 20-81-800, 20-81-810.
II
From 1953 until 2014, Dominion operated a coal-fired power plant at its Chesapeake site, which is situated on a peninsula surrounded by the Elizabeth River to the east, Deep Creek to the south, and a man-made *408 cooling channel to the west-all navigable waters.
While in operation, the Chesapeake plant generated large amounts of coal ash that Dominion stored on site. Coal ash was pumped as part of a slurry into settling ponds, and once the ash settled, the water was discharged into the nearby navigable waters, as authorized by a discharge permit issued by the VDEQ. Also, pursuant to a RCRA solid-waste permit issued by the VDEQ, Dominion stored dry coal ash in a landfill on the Chesapeake site. As a condition of this permit, Dominion was required to monitor the groundwater on the peninsula, and thus Dominion installed a system of wells around the edge of the peninsula that it used to conduct groundwater tests. The results of those tests were routinely submitted to the VDEQ for review.
Beginning in 2002, Dominion's tests revealed that the level of arsenic in the groundwater on the peninsula exceeded state groundwater protection standards. As required by its RCRA solid-waste permit, Dominion developed and implemented a corrective plan that it submitted to the VDEQ for public comment and agency review. The VDEQ approved the plan in 2008, and it was incorporated into Dominion's RCRA solid-waste permit in 2011.
In 2014, Dominion ceased operations at the Chesapeake plant, and by October 2015, it finished depositing coal ash on the site. In early 2016, Dominion submitted a permanent landfill closure plan and post-closure care plan to the VDEQ to be incorporated into its RCRA solid-waste permit. Dominion also submitted a closure plan and post-closure care plan for its settling ponds to the VDEQ for inclusion in its Clean Water Act discharge permit.
Sierra Club commenced this action in March 2015 against Dominion under the Clean Water Act's citizen-suit provision, 33 U.S.C. § 1365. The complaint alleged three ongoing violations of the Act. First , in Count One, it claimed that the seepage of arsenic from the coal ash into the nearby Elizabeth River and Deep Creek was violating § 1311(a) 's general prohibition against the unauthorized discharge of a pollutant from a point source into navigable waters. It asserted in particular that the coal ash storage facilities were point sources and that arsenic leached from them into the groundwater, which was "hydrologically connected" to the Elizabeth River and Deep Creek, thereby carrying arsenic to navigable waters. Second , in Count Two, it claimed that based on the same allegations, Dominion was violating Condition II.R of its Clean Water Act discharge permit. Finally , in Count Three, it claimed, again based on the same factual allegations, that Dominion was violating Condition II.F of its discharge permit. For relief, Sierra Club requested comprehensive injunctive relief, as well as the assessment of civil penalties.
Following a bench trial, the district court found that Dominion was violating § 1311(a), as alleged in Count One, but that it was not violating the two conditions, as alleged in Counts Two and Three. The district court rejected Dominion's argument that § 1311(a) of the Clean Water Act did not cover the seepage of arsenic from coal ash into the groundwater, concluding that the Act did indeed cover discharges into groundwater that had a "direct hydrological connection" to navigable waters such that the pollutant would reach navigable waters through the groundwater. And it found as fact that arsenic was reaching the Elizabeth River, Deep Creek, and the cooling channel in that manner. The court also rejected Dominion's argument that the landfill and settling ponds were not point sources because they were not conveyances. It stated, "Dominion built the [coal ash] piles and ponds to concentrate coal ash, and its constituent pollutants, in one location," and that that "one *409 location channels and conveys arsenic directly into the groundwater and thence into the surfacewaters." As to Counts Two and Three, however, the district court deferred to the VDEQ's determination that the discharge permit did not govern the seepage of pollutants into groundwater at the Chesapeake site. For relief, the court entered a limited injunction requiring Dominion to implement a plan in coordination with the VDEQ to address the pollution, and it declined to impose civil penalties.
From the district court's orders, Dominion filed this appeal challenging the court's conclusions (1) that the Clean Water Act regulates discharges into navigable waters through hydrologically connected groundwater and (2) that the coal ash piles and ponds constitute "point sources" under the Clean Water Act. Sierra Club cross-appealed, arguing that the district court wrongly deferred to the VDEQ's interpretation of the permit conditions contrary to the plain terms of those conditions. It also challenges the limited injunctive relief granted and the court's failure to award civil penalties.
III
Dominion contends first that the district court erred in concluding that the discharge of pollutants into groundwater that is hydrologically connected to navigable waters is regulated by the Clean Water Act, 33 U.S.C. §§ 1311(a), 1362(12) (prohibiting the "discharge of any pollutant" and defining discharge of a pollutant as the addition of a pollutant "to navigable waters from any point source"). It argues that § 1311(a) only regulates discharges directly into navigable waters, not discharges into groundwater that is connected to navigable waters.
That issue was recently addressed by us in Upstate Forever v. Kinder Morgan Energy Partners, L.P. , 887 F.3d 637 (4th Cir. 2018), where we held that the addition of a pollutant into navigable waters via groundwater can violate § 1311(a) if the plaintiff can show "a direct hydrological connection between [the] ground water and navigable waters." Id . at 651. In this case, the district court likewise concluded that "[t]he [Clean Water Act] regulates the discharge of arsenic into navigable surface waters through hydrologically connected groundwater," i.e. , "[w]here the facts show a direct hydrological connection between ground water and surface water." It then found as fact that the arsenic from the coal ash was seeping "directly into the groundwater and, from there, directly into the surface water."
As Dominion does not challenge the district court's factual findings on appeal, we apply Upstate Forever and thus reject Dominion's argument, affirming the district court on this point.
IV
Dominion also contends that the district court erred in concluding that the landfill and each of the settling ponds constituted a "point source," as required to find it liable under § 1311(a) of the Clean Water Act. Dominion argues that the landfill and settling ponds, rather than satisfying the statutory definition of "point source" as a "discernible, confined and discrete conveyance," 33 U.S.C. § 1362(14), are actually "stationary feature[s] of the landscape through which rainwater or groundwater can move diffusely," resulting in a type of discharge that the Clean Water Act does not regulate. It also notes that the regulation of this type of discharge is covered by the RCRA, which regulates the treatment and storage of solid waste like coal ash and its effects on surface waters and groundwaters.
In addressing the "point source" requirement of the Clean Water Act, the district court was satisfied that the landfill *410 and ponds were point sources because the rainwater and groundwater seeped through the coal ash , leaching arsenic into groundwater and ultimately into navigable waters. Describing that process in detail, the court stated that "precipitation percolates through the soil to the groundwater," which "moves freely through the sediment" and then "discharges to [the] surface water." The court acknowledged, however, that it could not "determine how much groundwater reaches the surface waters, or how much arsenic goes from the [site] to the surrounding waters." It added that "[a]ll tests of the surface waters surrounding the [site] have been well below the water quality criteria for arsenic" and that there were no "human health or environmental concerns around the [site]." Explaining specifically how these "coal ash piles," as the court called them, were "point sources," the court stated:
In determining whether a conveyance is a point source, "the ultimate question is whether pollutants were discharged from discernible, confined and discrete conveyance[s] either by gravitational or nongravitational means." Ohio Valley Envtl. Coal., Inc. v. Hernshaw Partners, LLC , 984 F.Supp.2d 589, 599 (S.D. W. Va. 2013)....
The Coal Ash Piles do precisely that. Dominion built the piles and ponds to concentrate coal ash, and its constituent pollutants, in one location. That one location channels and conveys arsenic directly into the groundwater and thence into the surface waters. Essentially, they are discrete mechanisms that convey pollutants from the old power plant to the river.
It stated in summary, "the Court finds that each of the Coal Ash Piles constitutes a point source because they are discrete conveyances of pollutants discharged into surface waters."
Put simply, therefore, the question presented is whether the landfill and settling ponds serve as "point sources" because they allow precipitation to percolate through them to the groundwater, which then carries arsenic to navigable waters.
We conclude that while arsenic from the coal ash stored on Dominion's site was found to have reached navigable waters - having been leached from the coal ash by rainwater and groundwater and ultimately carried by groundwater into navigable waters-that simple causal link does not fulfill the Clean Water Act's requirement that the discharge be from a point source . By its carefully defined terms, the Clean Water Act limits its regulation under § 1311(a) to discharges from "any discernible, confined and discrete conveyance ." 33 U.S.C. § 1362(14) (emphasis added). The definition includes, "but [is] not limited to[,] any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft." Id .; see also Consol. Coal Co. v. Costle , 604 F.2d 239, 249-50 (4th Cir. 1979), rev'd in part sub nom. EPA v. Nat'l Crushed Stone Ass'n , 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980) (finding that "discharges which are pumped, siphoned or drained" fall within the definition of discharges from a "point source"); Appalachian Power , 545 F.2d at 1373 (concluding that "point source" pollution does not include "unchanneled and uncollected surface waters"). At its core, the Act's definition makes clear that some facility must be involved that functions as a discrete, not generalized, "conveyance."
"Conveyance" is a well-understood term; it requires a channel or medium-i.e. , a facility-for the movement of something from one place to another. See Webster's Third New International Dictionary 499 (1961); The American Heritage Dictionary *411 of the English Language 291-92 (1976); see also S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians , 541 U.S. 95, 105, 124 S.Ct. 1537, 158 L.Ed.2d 264 (2004) ("[A] point source need not be the original source of the pollutant; it need only convey the pollutant to 'navigable waters' " (emphasis added)). If no such conveyance produces the discharge at issue, the discharge would not be regulated by the Clean Water Act, though it might be by the RCRA, which covers and regulates the storage of solid waste, including coal ash, and its effect on groundwater.
Here, the arsenic was found to have leached from static accumulations of coal ash on the initiative of rainwater or groundwater, thereby polluting the groundwater and ultimately navigable waters. In this context, the landfill and ponds were not created to convey anything and did not function in that manner; they certainly were not discrete conveyances, such as would be a pipe or channel, for example. Indeed, the actual means of conveyance of the arsenic was the rainwater and groundwater flowing diffusely through the soil. This diffuse seepage, moreover, was a generalized, site-wide condition that allowed rainwater to distribute the leached arsenic widely into the groundwater of the entire peninsula. Thus, the landfill and settling ponds could not be characterized as discrete "points," nor did they function as conveyances. Rather, they were, like the rest of the soil at the site, static recipients of the precipitation and groundwater that flowed through them. Accordingly, we conclude that the court erred in finding that the landfill and ponds were point sources as defined in the Clean Water Act.
This understanding of the Clean Water Act's point-source requirement is consistent with the larger scheme of pollution regulation enacted by Congress. In regulating discharges of pollutants from point sources, Congress clearly intended to target the measurable discharge of pollutants. Not only is this revealed by the definitional text of "point source," but it is also manifested in the effluent limitation enforcement scheme that the Clean Water Act employs. The National Pollutant Discharge Elimination System Program and § 1311 's enforcement scheme specifically rely on "effluent limitation[s]"-restrictions on the "quantities, rates, and concentrations" of pollutants discharged into navigable waters. 33 U.S.C. § 1362(11) (defining "effluent limitation"). And state-federal permitting programs under the Clean Water Act apply these precise, numeric limitations to discrete outfalls and other "point sources," see California ex rel. Res. Control Bd. , 426 U.S. at 205-08, 96 S.Ct. 2022, at which compliance can be readily monitored. When a source works affirmatively to convey a pollutant, the concentration of the pollutant and the rate at which it is discharged by that conveyance can be measured . But when the alleged discharge is diffuse and not the product of a discrete conveyance, that task is virtually impossible. Tellingly, the district court in this case concluded candidly that it could not "determine how much groundwater reaches the surface waters, or how much arsenic goes from the [plant site] to the surrounding waters. It could be a few grams each day, or a much larger amount." Such indeterminate and dispersed percolation indicates the absence of any facility constituting a discernible, confined, and discrete conveyance. Moreover, it indicates circumstances that are incompatible with the effluent limitation scheme that lies at the heart of the Clean Water Act.
Of course, the fact that such pollution falls outside the scope of the Clean Water Act's regulation does not mean that it slips through the regulatory cracks. To the contrary, the EPA classifies coal ash and other coal combustion residuals as nonhazardous *412 waste governed by the RCRA, see 40 C.F.R. §§ 257.50, 257.53, and it has issued regulations pursuant to the RCRA imposing specific guidelines for the construction, management, and ultimate closure of coal ash sites, including, notably, obligations to monitor groundwater quality and undertake any necessary corrective action, see 40 C.F.R. §§ 257.90 - 257.98. In 2016, Congress amended the RCRA specifically to require that operators of coal ash landfills, surface impoundments, and similar facilities obtain permits incorporating the EPA's regulations pertaining to the disposal of coal combustion residuals. See 42 U.S.C. § 6945(d). And Virginia operates just such a program. See Va. Code Ann. § 10.1-1408.1 ; 9 Va. Admin. Code §§ 20-81-800, 20-81-810.
In this case, the district court blurred two distinct forms of discharge that are separately regulated by Congress-diffuse discharges from solid waste and discharges from a point source-and concluded that any discharge from an identifiable source of coal ash, even that resulting from precipitation and groundwater seepage, is regulated by the Clean Water Act. But by concluding that the point-source requirement was satisfied by the pile or pond containing coal ash through which the water seeps, the court revealed a misunderstanding of the distinctions Congress made between the Clean Water Act and the RCRA. In describing how precipitation falls through the coal ash and percolates into the groundwater via the soil, the court identified a process that does not employ a discrete conveyance at all. The only "conveying" action referred to by the district court was that of the non-polluted water moving through static piles of coal ash and carrying arsenic into the soil. That water, as Sierra Club concedes, cannot itself be the requisite point source. Perhaps recognizing its need for finding a facility of conveyance, the court attempted abstractly to construct one, stating: "Dominion built the piles and ponds to concentrate coal ash, and its constituent pollutants, in one location," and "[t]hat one location channels and conveys arsenic directly into the groundwater." That movement of pollutants, however, was not a function of the coal ash piles or ponds, but rather the result of a natural process of "precipitation percolat[ing] through the soil to the groundwater." And that groundwater pollution from solid waste falls squarely within the regulatory scope of the RCRA. By contrast, the coal ash piles and ponds, from which arsenic diffusely seeped, can hardly be construed as discernible, confined, or discrete conveyances, as required by the Clean Water Act.
Sierra Club nonetheless maintains that at least the settling ponds were point sources because they were "containers," one of the facilities included as examples in the definition of point source. See 33 U.S.C. § 1362(14). But in so arguing, Sierra Club would have us read the critical, limiting word "conveyance" out of the definition. Regardless of whether a source is a pond or some other type of container, the source must still be functioning as a conveyance of the pollutant into navigable waters to qualify as a point source. In this case, the diffuse seepage of water through the ponds into the soil and groundwater does not make the pond a conveyance any more than it makes the landfill or soil generally a conveyance.
Sierra Club also seeks to support the district court's conclusion by pointing to several decisions from other courts, but they provide it with little assistance. In United States v. Earth Sciences, Inc. , for example, the court addressed overflows from a contaminated-water collection system, described by the court as a "closed circulating system," which involved the repeated spray, collection, and then pumping of a contaminated solution through the *413 system-i.e. , a system of conveyances. 599 F.2d 368, 374 (10th Cir. 1979) (emphasis added). As such, when that system "fail[ed] because of flaws in the construction or inadequate size to handle the fluids utilized, with resulting discharge, ... the escape of liquid from the confined system [was] from a point source." Id . In other words, in the process of conveying this contaminated liquid through the system, the liquid escaped. Likewise, in Sierra Club v. Abston Constr. Co. , 620 F.2d 41, 45 (5th Cir. 1980), the court, while recognizing that the source of a pollutant regulated by § 1311(a) might be a spoil or refuse pile, noted that the facilities that actually transport the pollutant must be point sources -giving as examples, "ditches, gullies and similar conveyances." Rather than confirming the district court's conclusion, these cases undermine it, clearly identifying as point sources facilities, functioning as conveyances, from which the contaminant was discharged. The passive coal ash piles and ponds here are hardly analogous.
For the reasons given, we reverse the district court's ruling that Dominion violated § 1311(a) of the Clean Water Act.
V
On its cross-appeal, Sierra Club contends that the district court erred in ruling that Dominion did not violate general Conditions II.F and II.R to the Clean Water Act discharge permit issued by the VDEQ. Sierra Club argues that the same factual findings used by the district court to conclude that Dominion violated the Clean Water Act required the court to conclude that Dominion also violated the Conditions. In determining otherwise, according to Sierra Club, the district court disregarded the Conditions' clear language. More particularly, Sierra Club argues that the term "state waters," as used in both Conditions, is broader than the coverage of the Clean Water Act because Virginia Code § 62.1-44.3 defines "state waters" to include "all water, on the surface and under the ground." It thus contends that contamination of the groundwater alone violates the Conditions-contamination that the court found as fact in ruling on the Clean Water Act claim. It argues further that even if "state waters" do not include groundwater, the same discharges to navigable waters via hydrologically-connected groundwater identified by the district court should suffice to show a violation of the permit Conditions.
At trial, however, the VDEQ made clear that it did not consider the Clean Water Act discharge permits to cover groundwater contamination and that they only covered discharges from point sources into navigable waters, as stated in the Clean Water Act. Ruling in Dominion's favor, the district court stated that because the VDEQ "believes that [Dominion's] permits do not apply to groundwater, and therefore has found no violations," it was "defer[ring] to the [VDEQ's] decision finding Dominion in compliance."
While we might have wished for more explanation from the district court in support of its decision to defer, especially since Sierra Club argued that the VDEQ's position was not supported by the plain language of the permits, we agree with both the VDEQ and Dominion that the subject Conditions must be read in context to give them their appropriate meaning and scope.
The text of Condition II.F reads that "[e]xcept in compliance with this permit," "it shall be unlawful for any person to ... [d ]ischarge into state waters sewage, industrial wastes, other wastes, or any noxious or deleterious substances." (Emphasis added). In the context of the Clean Water Act, the phrase "discharge into state waters" has a particular meaning, and the VDEQ regulations recognize this, defining "discharge" to mean the addition of pollutants *414 "from any point source ." 9 Va. Admin. Code § 25-31-10 (emphasis added). Condition II.F thus operates as the Commonwealth's counterpart to the permit's expressly authorized discharges, reiterating 33 U.S.C. § 1311(a) 's prohibition against discharges from a point source not otherwise authorized by permit. Because we have concluded that arsenic seeping into the groundwater from the coal ash piles and ponds does not constitute a point-source discharge, we agree with the VDEQ that Dominion was also not violating Condition II.F.
Condition II.R must be understood in the same way. Like Condition II.F, Condition II.R is a general provision appended to all Clean Water Act discharge permits issued by the VDEQ. It provides that "[s]olids, sludges or other pollutants removed in the course of treatment or management of pollutants shall be disposed of in a manner so as to prevent any pollutant from such materials from entering state waters." While that language may appear to be broader than Condition II.F, insofar as it seems to prohibit "any pollutant from ... entering state waters" (emphasis added), it nonetheless remains a condition limited in scope by its context in the Clean Water Act permit, which is specifically issued to regulate "discharges" into state waters. Were this selected language in Condition II.R to be given its literal meaning, it would subsume all the other permit conditions, as well as the substantive terms of the permit itself, which clearly authorize specified discharges. As one example, Condition I.D.7 states that all materials used in and by-products resulting from the facility's operation, including "industrial wastes," must be "handled, disposed of and/or stored in such a manner so as not to permit a discharge of such product, materials, industrial wastes and/or other wastes to State waters, except as expressly authorized." The VDEQ confirmed at trial that the coal ash stored in the landfill and ponds is "industrial waste" governed by this Condition. It would make little sense for the VDEQ to include this Condition, which, unlike Condition II.R, is particularized to the Chesapeake site, if Condition II.R were to nullify it by prohibiting any removed pollutant from any source and in any amount from reaching groundwater or surface water-as Sierra Club seeks to have us read it.
Moreover, the VDEQ has over the years consistently interpreted Condition II.R to apply only to point-source discharges to surface waters. It explained that the Condition is one of several boilerplate provisions that it appends to all discharge permits it issues, and that the Condition is included specifically to address the solids and sludges physically stored on site without appropriate storm water control, which could "result[ ] in a discharge or potential discharge" to surface waters. Dominion too stated that this was its understanding of II.R's scope and that this had been its understanding since the VDEQ first began issuing discharge permits to it. In addition, the VDEQ has never found Dominion to be in violation of the Condition, even when it knew, prior to issuing Dominion's most recent discharge permit, that groundwater monitoring reports indicated that arsenic was leaching into the groundwater. Thus, both parties to the permit shared an understanding of what the permit says and how it is to be enforced. See Restatement (Second) of Contracts § 201 cmt. c (1981) ("[T]he primary search is for a common meaning of the parties, not a meaning imposed on them by the law"); Ohio Valley Envtl.Coal. v. Fola Coal Co., LLC , 845 F.3d 133, 138 (4th Cir. 2017) (construing Clean Water Act permits as contracts would be construed).
Finally, our interpretation is confirmed when we consider the scope of the permit in its broader regulatory context. In addition *415 to its discharge permit under the Clean Water Act, Dominion manages the Chesapeake site pursuant to a solid-waste permit under the RCRA and Virginia's Solid Waste Management laws. That permit and those laws authorized Dominion to store coal ash on the Chesapeake site, provided that Dominion complied with stated conditions and restrictions. Notably, Dominion was required to monitor the groundwater at the site, and in 2002 when it reported finding arsenic levels in the groundwater that exceeded Virginia's standards, it and the VDEQ developed a corrective action plan for the site in the context of the solid-waste permit under the RCRA . In addition, the VDEQ made clear throughout trial in this case that it continues to address the groundwater pollution, not through enforcement of the Clean Water Act discharge permit, but through enforcement of the solid-waste permit issued under the RCRA and Virginia's Solid Waste Management laws. It would thus upend this regulatory scheme to read a single, general condition included in Dominion's Clean Water Act discharge permit to cover conduct explicitly addressed elsewhere. If Sierra Club were intent on challenging the efforts of Dominion and the VDEQ in managing the coal ash storage, it could have sought to employ the RCRA's citizen-suit provision, 42 U.S.C. § 6972, to do so.
* * *
For the reasons given, we reverse the district court's conclusion that Dominion violated the Clean Water Act, and we affirm its ruling that Dominion did not violate the two Conditions of its Clean Water Act discharge permit issued by the VDEQ.
AFFIRMED IN PART AND REVERSED IN PART