RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0006p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

TENNESSEE CLEAN WATER NETWORK; TENNESSEE SCENIC RIVERS ASSOCIATION,

        *Plaintiffs-Appellees*,

    *v.*

TENNESSEE VALLEY AUTHORITY,

        *Defendant - Appellant*.

No. 17-6155

───────────────

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:15-cv-00424—Waverly D. Crenshaw Jr., District Judge.

Decided and Filed: January 17, 2019

Before: SUHRHEINRICH, CLAY, and GIBBONS, Circuit Judges.

───────────────

## COUNSEL

**ON PETITION FOR REHEARING EN BANC:** Frank S. Holleman, III, Nicholas S. Torrey, Leslie Griffith, SOUTHERN ENVIRONMENTAL LAW CENTER, Chapel Hill, North Carolina, Amanda Garcia, Anne E. Passino, SOUTHERN ENVIRONMENTAL LAW CENTER, Nashville, Tennessee, Michael S. Kelley, Briton S. Collins, KENNERLY, MONTGOMERY & FINLEY, P.C., Knoxville, Tennessee, for Appellees. **ON RESPONSE IN OPPOSITION:** David D. Ayliffe, James S. Chase, F. Regina Koho, Lane E. McCarty, TENNESSEE VALLEY AUTHORITY, Knoxville, Tennessee, for Appellant.

      STRANCH, J. (pp. 3–6), delivered a separate dissenting opinion in which COLE, C.J., and MOORE, CLAY, WHITE, and DONALD, JJ., joined. A copy of Judge Clay's dissent to the court's opinion of September 24, 2018 is appended, (app. 1–11).

---

**ORDER**

---

The court received a petition for rehearing en banc. The original panel has reviewed the petition for rehearing and concludes that the issues raised in the petition were fully considered upon the original submission and decision. The petition then was circulated to the full court. Less than a majority of the judges voted in favor of rehearing en banc.

Therefore, the petition is denied.

Judge Clay would grant rehearing for the reasons stated in his dissent.

———————————

## DISSENT

———————————

JANE B. STRANCH, Circuit Judge, dissenting from the denial of rehearing en banc.  In seeking to harmonize the Clean Water Act (CWA) and the Resource Conservation and Recovery Act (RCRA), the majority opinion in this case takes up an issue of exceptional importance.  Its holding that the CWA does not apply to discharges of pollutants from coal ash ponds that reach surface waters after traveling through groundwater (1) relies on a single preposition that is not found in the CWA provision at issue and (2) is at odds with every other circuit and our own precedent.  I therefore respectfully dissent from the denial of en banc review.

The district court concluded its 123-page opinion by explaining that, with the benefit of hindsight and decades of data, "it is difficult to imagine why anyone would choose to build an unlined [coal] ash waste pond in karst terrain immediately adjacent to a river." (R. 258, PageID 10,542)  TVA does not contest the district court's factual finding that pollutants from these ash ponds reached a navigable river.  Nor could it.  TVA's expert "conceded that there is coal ash in the Cumberland River in the area surrounding the Gallatin Plant, as shown by TVA's own testing." (*Id.*, PageID 10,486)  The danger of coal ash to riverine environments and to the communities that depend on that river is indisputable—and, indeed, the majority does not attempt to dispute it. *See Tenn. Clean Water Network v. TVA*, 905 F.3d 436, 447 (6th Cir. 2018).

We need not look far to find a vivid example of how that danger affects Tennesseans.  Just last month, an East Tennessee jury returned a verdict against Defendant TVA in a suit brought by the workers who cleaned up a 2008 coal ash spill. *See Adkisson v. Jacobs Eng'g Grp., Inc.*, No. 3:13-CV-00505, D.E. 408 (E.D. Tenn.).  Media coverage of the case stated that 30 of the workers are dead and more than 250 are sick or dying.[1]  And the problems did not end with the cleanup.  Recent journalism reports that coal ash storage facilities established in the

———————————

[1] *See* Jamie Satterfield, *Jury: Jacobs Engineering Endangered Kingston Disaster Clean-up Workers*, *Knoxville News Sentinel* (Nov. 7, 2018, 12:02 PM), https://www.knoxnews.com/story/news/crime/2018/11/07/verdict-reached-favor-sickened-workers-coal-ash-cleanup-lawsuit/1917514002/.

wake of that disaster are already leaking arsenic and radium into groundwater and that the EPA has found a spike in coal ash constituents in groundwater test wells.[2]

This environmental issue reaches beyond Tennessee's problem with TVA's coal ash ponds. Many other types of installations pollute navigable waters via discharges to groundwater. *See, e.g.*, *Upstate Forever v. Kinder Morgan Energy Partners, LP*, 887 F.3d 637, 643–44 (4th Cir. 2018) (describing 369,000 gallons of gasoline spilled from an underground pipeline that leaked through groundwater into creeks, lakes, and a river). The majority opinion, in seeking to harmonize the CWA and RCRA, has deprived regulators and affected citizens of a critical tool— in some circumstances, the only tool—to combat those various types of seeping pollution.

That result is not mandated by statutory text. The only support the majority opinion finds in the text of the CWA is the word "into." *Tenn. Clean Water Network*, 905 F.3d at 444. I agree with the dissent that it is dubious that Congress hid such a sizable loophole in a preposition— especially in a preposition that is not even found in the portion of the statute at issue in this case. *Id.* at 450–51 (Clay, J., dissenting). And even if we assume that the meaning of the word "into" is the critical inquiry, the definitions cited by the majority require only entry, not "direct" entry. *See Rapanos v. United States*, 547 U.S. 715, 743 (2006) (plurality) (Scalia, J.) ("The Act does not forbid the 'addition of any pollutant *directly* to navigable waters from any point source,' but rather the 'addition of any pollutant *to* navigable waters.'" (citations omitted)). Pollutants are discharged from coal ash ponds *into* navigable waters just as a rocket is launched from the ground *into* space or a path leads from a city *into* a forest—inevitably, but not immediately.

The majority opinion's only other rationale is that "allowing the CWA to cover pollution of this sort would disrupt the existing regulatory framework" under RCRA. *Tenn. Clean Water Network*, 905 F.3d at 445. But we have answered that claim before and clarified how the CWA (which governs water pollution) and RCRA (which governs disposal of solid and hazardous waste) interact. When a polluting factory operator claimed that the hazardous waste dumped into a lagoon was exempt from RCRA because the lagoon was governed by the CWA, we explained

---

[2]*See* Jamie Satterfield, *Testing Reveals Groundwater Contamination Threat from TVA's Kingston Coal Ash Landfill*, *Knoxville News Sentinel* (Dec. 13, 2018, 5:00 AM), https://www.knoxnews.com/story/news/crime/2018/12/13/kingston-coal-ash-landfill-roane-county-groundwater-testing/2283487002/.

that "only the actual discharges from a holding pond or similar feature into surface waters . . . are governed by the Clean Water Act, not the contents of the pond or discharges into it." *United States v. Dean*, 969 F.2d 187, 194 (6th Cir. 1992). So too with coal ash ponds. "Actual discharges" from the ponds to surface waters are governed by the CWA, and everything else— from the strength of the embankment surrounding a pond to the frequency of its inspections and the design of its liner—is governed by RCRA. This reading acknowledges the realistic interaction between the two Acts, and their sensible enforcement relationship. It does not "effectively nullify" RCRA's implementing regulations.[3] *Tenn. Clean Water Network*, 905 F.3d at 446 (citation omitted).

The majority's interpretation, on the other hand, *could* effectively nullify RCRA. The majority reasons that, if a coal ash pond received a CWA permit, it would be removed from RCRA's coverage. *Id.* By this logic, if a landfill has a system for collecting rainwater and discharging it into a river, governed by the CWA pursuant to 40 C.F.R. Part 445, the rest of the landfill's operations would be exempt from RCRA. Likewise, if TVA's own power plants have CWA permits pursuant to 40 C.F.R. Part 423, the plants' other operations would be exempt from RCRA—including, presumably, its rules about disposal of coal ash. But that is indisputably not the case.

In light of my disagreement with the two bases of the majority's decision, I do not think splitting from every other circuit that has considered this issue is warranted. *See Upstate Forever*, 887 F.3d at 650 ("[A] point source is the starting point or cause of a discharge under the CWA, but that starting point need not also convey the discharge directly to navigable waters."); *Haw. Wildlife Fund v. County of Maui*, 886 F.3d 737, 746 (9th Cir. 2018) ("This case is no different—the effluent comes 'from' the four wells and travels 'through' them before entering navigable waters. It just also travels through groundwater before entering the Pacific Ocean." (citation omitted)); *see also Waterkeeper All., Inc. v. EPA*, 399 F.3d 486, 510–11 (2d Cir. 2005)

---

[3]Indeed, the Environmental Protection Agency proposed the Coal Combustion Residuals (CCR) Rule pursuant to RCRA while acknowledging that the CWA governs discharges from coal ash ponds to surface waters. *See* Hazardous and Solid Waste Management System, 75 Fed. Reg. 35,128, 35,142 (June 21, 2010) ("The discharge of pollutants from CCR management units to waters of the United States are regulated under the National Pollutant Discharge Elimination System (NPDES) at 40 CFR Part 122, authorized by the Clean Water Act (CWA).").

(holding manure spread across fields is a point source); *Sierra Club v. Abston Constr. Co.*, 620 F.2d 41, 45 (5th Cir. 1980) (holding "gravity flow" from miners' spoil piles is a point source).[4]

Though I appreciate the majority's acknowledgement of the importance of identifying some path to a remedy, I do not think it is accurate to conclude that "other environmental laws have been enacted to remedy" pollution that seeps from coal ash ponds into surface waters. *Tenn. Clean Water Network*, 905 F.3d at 447. I doubt the feasibility of using a statute designed to govern solid waste to regulate pollution of rivers. I am even less confident that existing environmental law can fill the new loopholes created now that a polluter can escape liability under the CWA "by moving its drainage pipes a few feet from the river bank." *Id.* (Clay, J., dissenting). For these reasons and those articulated more fully in Judge Clay's dissenting opinion, I respectfully dissent from the denial of rehearing en banc.

ENTERED BY ORDER OF THE COURT

_____
Deborah S. Hunt, Clerk

---

[4]Neither of the cases TVA now cites as showing a circuit split stands for the proposition at issue here—that identifiable, measurable pollution that reaches surface waters after traveling through groundwater is not covered under the CWA. *Village of Oconomowoc Lake v. Dayton Hudson Corp.* holds only that the CWA does not "assert[] authority over ground waters, just because these may be hydrologically connected with surface waters." 24 F.3d 962, 965 (7th Cir. 1994). There is no dispute that groundwater is outside the scope of the CWA; the issue is whether pollution of surface water is excused because the pollutants first traveled through groundwater. *Rice v. Harken Exploration Co.* interprets the Oil Pollution Act of 1990 (OPA), not the CWA. 250 F.3d 264, 266–67 (5th Cir. 2001). Even assuming the case is relevant, *Rice* holds only that, when "nothing in the record . . . could convince a reasonable trier of fact that either Big Creek or any of the unnamed other intermittent creeks on the ranch are sufficiently linked to an open body of navigable water as to qualify for protection under the OPA," then "a generalized assertion that covered surface waters will eventually be affected by remote, gradual, natural seepage from the contaminated groundwater is insufficient to establish liability under the OPA." *Id.* at 271–72. In this case, plaintiffs do not rely on a "generalized assertion," but rather on a substantial body of evidence—including, as described above, the concession of TVA's expert—showing pollutants from coal ash ponds entered a navigable river.

---

**APPENDIX**

---

CLAY, Circuit Judge, dissenting.  Can a polluter escape liability under the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251–1387, by moving its drainage pipes a few feet from the riverbank?  The Fourth and Ninth Circuits have said no.  In two cases today,[1] the majority says yes.  Because the majority's conclusion is contrary to the plain text and history of the CWA, and because I disagree with the majority's analysis of the permit's Sanitary Sewer Overflow provision, I respectfully dissent from the majority's position as to these issues.

## I.      Scope of the Clean Water Act

Plaintiffs have invoked the CWA's citizen-suit provision, which provides that "any citizen may commence a civil action . . . against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation under this chapter[.]"  33 U.S.C. § 1365(a).  "For purposes of this section, the term 'effluent standard or limitation under this chapter' means," among other possibilities, "an unlawful act under subsection (a) of section 1311 of this title."  § 1365(f).  In turn, § 1311(a) prohibits "the discharge of any pollutant by any person[.]"

The broad sweep of a defendant's potential CWA liability is limited in two ways.  First, Congress included a list of exceptions in § 1311(a) itself:  the discharge of a pollutant is unlawful "[e]xcept in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title."  Second, Congress gave the phrase "discharge of a pollutant" a very specific definition:  it means "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12)(A).  Taken together, Congress thus authorized citizen suits to prevent the "addition of any pollutant to navigable waters from any point source," *see* § 1362(12)(A), but if a listed statutory exception applies, *see* § 1311(a).

The majority argues that this standard cannot be satisfied when, as here, pollution travels briefly through groundwater before reaching a navigable water.  Plaintiffs counter that such an

---

[1]The other case is Case No. 18-5115, *Kentucky Waterways Alliance, et al. v. Kentucky Utilities Co.*

exception has no statutory basis and would allow polluters to shirk their CWA obligations by placing their underground drainage pipes a few feet away from the shoreline.  This case could have profound implications for those in this Circuit who would pollute our Nation's waters.  And the issue is novel.  This Court has never before considered whether the CWA applies in this context.

However, the Fourth and Ninth Circuits have.  Both courts determined that a short journey through groundwater does not defeat CWA liability.  *See Upstate Forever v. Kinder Morgan Energy Partners, L.P.*, 887 F.3d 637, 649–51 (4th Cir. 2018); *Hawai'i Wildlife Fund v. Cty. of Maui*, 886 F.3d 737, 745–49 (9th Cir. 2018).  The Second Circuit reached a similar conclusion where the pollutants traveled briefly through fields (which are not necessarily point sources) and through the air.  *See Concerned Area Residents for Env't v. Southview Farm*, 34 F.3d 114, 118–19 (2d Cir. 1994) (fields); *Peconic Baykeeper, Inc. v. Suffolk Cty.*, 600 F.3d 180, 188–89 (2d Cir. 2010) (air).  Until today, no Circuit had come out the other way.  The reason is simple:  the CWA does not require a plaintiff to show that a defendant discharged a pollutant from a point source *directly* into navigable waters; a plaintiff must simply show that the defendant "add[ed] . . . any pollutant *to* navigable waters *from* any point source."  *See* §§ 1362(12)(A) (emphases added), 1365(a), 1311(a); *Upstate Forever*, 887 F.3d at 650; *Hawai'i Wildlife Fund*, 886 F.3d at 749.

The Supreme Court addressed this precise issue in *Rapanos v. United States*, 547 U.S. 715 (2006).  There, Justice Scalia's plurality opinion was explicit:

> The Act does not forbid the "addition of any pollutant *directly* to navigable waters from any point source," but rather the "addition of any pollutant *to* navigable waters."  [33 U.S.C.] § 1362(12)(A) (emphasis added); § 1311(a).  Thus, from the time of the CWA's enactment, lower courts have held that the discharge into intermittent channels of any pollutant *that naturally washes downstream* likely violates § 1311(a), even if the pollutants discharged from a point source do not emit "directly into" covered waters, but pass "through conveyances" in between.  *United States v. Velsicol Chemical Corp.*, 438 F. Supp. 945, 946–947 (W.D.Tenn. 1976) (a municipal sewer system separated the "point source" and covered navigable waters). See also *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1137, 1141 (C.A.10 2005) (2.5 miles of tunnel separated the "point source" and "navigable waters").

*Id.* at 743 (plurality opinion) (emphasis in original). True, Justice Scalia's plurality opinion is not binding. But no Justice challenged this aspect of the opinion, and for good reason: the statutory text unambiguously supports it.

Further, applying the CWA to point-source pollution traveling briefly through groundwater before reaching a navigable water promotes the CWA's primary purpose, which is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). By contrast, the majority's approach defeats the CWA's purpose by opening a gaping regulatory loophole: polluters can avoid CWA liability by discharging their pollutants into groundwater, even if that groundwater flows immediately into a nearby navigable water. This exception has no textual or logical foundation. As one district court observed,

> it would hardly make sense for the CWA to encompass a polluter who discharges pollutants via a pipe running from the factory directly to the riverbank, but not a polluter who dumps the same pollutants into a man-made settling basin some distance short of the river and then allows the pollutants to seep into the river via the groundwater.

*See N. Cal. River Watch v. Mercer Fraser Co.*, No. C-04-4620 SC, 2005 WL 2122052, at *2 (N.D. Cal. Sept. 1, 2005). In addition, this exception has no apparent limits. Based on the majority's logic, polluters are free to add pollutants to navigable waters so long as the pollutants travel through any kind of intermediate medium—for example through groundwater, across fields, or through the air. This would seem to give polluters free rein to discharge pollutants from a sprinkler system suspended above Lake Michigan. After all, pollutants launched from such a sprinkler system would travel "in all directions, guided only by the general pull of gravity." *Kentucky Waterways Alliance*, 18-5115 at 11. According to the majority, this would defeat CWA liability.[2]

---

[2]The majority declines to reverse the district court's other finding that a coal ash pond is a point source under the CWA, but suggests disagreement in a footnote. The CWA defines "point source" as "any discernible, confined and discrete conveyance," including "any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). The majority cites a recent Fourth Circuit case, *Sierra Club v. Va. Elec. & Power Co.*, No. 17-1952, --- F.3d ---, 2018 WL 4343513 (4th Cir. Sept. 12, 2018), which held that a coal ash pond is not a point source because it was a "static recipient[] of the precipitation and groundwater that flowed through [it]." 2018 WL 4343513 at *6. Looking at the text of the CWA, however, shows that, *inter alia*, "ditch[es], well[s], container[s]," and "vessel[s]" are included in the definition. 33 U.S.C. § 1362(14). The canon of *ejusdem generis* states that "the general term must take its meaning from the specific terms with which it appears." *Retail Ventures, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 691 F.3d 821, 833 (6th Cir. 2012). The common denominator between wells,

I have a very different view.  In cases where, as here, a plaintiff alleges that a defendant is polluting navigable waters through a complex pathway, the court should require the plaintiff to prove the existence of pollutants in the navigable waters and to persuade the factfinder that the defendant's point source is to blame—that the defendant is unlawfully "add[ing] . . . any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12)(A).  The more complex the pathway, the more difficult the proof.  Where these cases are plausibly pleaded, they should be decided on the facts.

Instead, the majority holds that a plaintiff may never—as a matter of law—prove that a defendant has unlawfully added pollutants to navigable waterways via groundwater.  For its textual argument, the majority refers us to the term "effluent limitations."  This term, the majority says, is defined as "restrictions on the amount of pollutants that may be 'discharged from point sources *into* navigable waters.'"  Maj. Op. at 11 (quoting with emphasis 3 U.S.C. § 1362(11)).  Seizing on the word "into"—which denotes "entry, introduction, insertion"—the majority concludes that the effluent-limitation definition implicitly creates an element of "directness."  In other words, the majority reasons, "for a point source to discharge *into* navigable waters, it must dump *directly* into those navigable waters[.]"  *Id.* (emphasis in original).

---

containers, ditches, and vessels is that each is a man-made, defined area where liquid collects.  The canon of *ejusdem generis* thus suggests that man-made coal ash ponds are included in this definition.  The Fourth Circuit instead cites a dictionary definition of "conveyance" as "a facility—for the movement of something from one place to another" without explaining how items like wells, containers, and vessels fit this definition.  *Va. Elec. & Power Co.*, 2018 WL 4343513, at *5 (quoting *Webster's Third New International Dictionary* 499 (1961)).  The Fourth Circuit suggests that a container can be a point source only if it is in the act of conveying something, 2018 WL 4343513, at *7, ignoring that the statutory definition includes "*any* … container … from which pollutants are or may be discharged."  33 U.S.C. § 1362(14) (emphasis added).

The Fourth Circuit's approach is further misguided in that it conflicts with the broad interpretation that federal courts have traditionally given to the phrase "point source."  *See, e.g.*, *Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 219 (2d Cir. 2009) (quoting *Dague v. City of Burlington,* 935 F.2d 1343, 1354–55 (2d Cir. 1991), *rev'd on other grounds*, 505 U.S. 557 (1992)) ("[T]he definition of a point source is to be broadly interpreted."); *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 955 (9th Cir. 2002) (quoting *Dague,* 935 F.2d at 1354–55; *Cmty. Ass'n for Restoration of Env't (CARE) v. Sid Koopman Dairy*, 54 F. Supp. 2d 976, 980 (E.D. Wash. 1999) (citing *Dague,* 935 F.2d at 1354–55); *Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC*, 141 F. Supp. 3d 428, 444 (M.D. N.C. 2015) (quoting *Dague,* 935 F.2d at 1354–55); *see United States v. Earth Scis., Inc.*, 599 F.2d 368, 373 (10th Cir. 1979) ("[T]he concept of a point source was designed to further [the CWA's regulatory] scheme by embracing the broadest possible definition of any identifiable conveyance from which pollutants might enter the waters of the United States.").  By embracing a restrictive definition of what constitutes a point source, the Fourth Circuit jettisons these long-standing principles.

The majority is way off the rails.  First of all, "Congress 'does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.'"  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1626–27 (2018) (quoting *Whitman v. Am. Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001)).  The majority should heed this commonsense advice.  Congress did not hide a massive regulatory loophole in its use of the word "into."

But more importantly, the majority's quoted definition of "effluent limitation" from § 1362(11)—the supposed origin of the loophole—is not relevant to this case.  The citizen-suit provision uses the term "effluent standard or limitation"—not the term "effluent limitation."  *See* 33 U.S.C. § 1365(f).  As the majority itself argues, minor distinctions in statutory language sometimes matter.  This one does.  The phrase "effluent standard or limitation" is a term of art and is wholly distinct from the term "effluent limitation."  This conclusion is supported not by tea leaves or a carefully selected dictionary, but rather by the CWA itself.  The citizen-suit provision of the CWA provides that "effluent standard or limitation" means, among other things, "an unlawful act under subsection (a) of section 1311 of this title."  33 U.S.C. § 1365(a).  Turning to § 1311(a), we find that, absent certain exceptions, "the discharge of any pollutant by any person shall be unlawful," § 1311(a), and the "discharge of a pollutant" means "any addition of any pollutant *to* navigable waters from any point source," § 1362(12)(A) (emphasis added).  Thus, even assuming the majority correctly parses the definition of "into"—a dubious proposition at best—the word "into" is not contained in any of the statutory provisions at issue.  Rather, we find the word "to," which does not even arguably suggest a requirement of directness; the word "to" merely "indicate[s] movement or an action or condition suggestive of movement toward a place, person, or thing reached."  *To*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/to.

It is therefore entirely unclear why the majority relies on the definition of "effluent limitation."  That definition is simply irrelevant to this lawsuit.  As a result, the majority's criticisms of the approach taken by the Fourth and Ninth Circuits miss the mark.  Indeed, the Fourth Circuit analyzed the correct statutory text when it rejected the argument that the citizen-suit provision requires directness:

> [t]he plain language of the CWA requires only that a discharge come "from" a "point source." *See* 33 U.S.C. § 1362(12)(A). Just as the CWA's definition of a discharge of a pollutant does not require a discharge directly to navigable waters, *Rapanos*, 547 U.S. at 743, 126 S.Ct. 2208, neither does the Act require a discharge directly from a point source, *see* 33 U.S.C. § 1362(12)(A). The word "from" indicates "a starting point: as (1) a point or place where an actual physical movement . . . *has its beginning*." Webster's Third New International Dictionary 913 (Philip Babcock Gove et al. eds., 2002) (emphasis added); *see also* The American Heritage Dictionary of the English Language 729 (3d ed. 1992) (noting "from" indicates a "starting point" or "cause"). Under this plain meaning, a point source is the starting point or cause of a discharge under the CWA, but that starting point need not also convey the discharge directly to navigable waters.

*Upstate Forever*, 887 F.3d at 650 (footnote omitted). In short, if the majority would like to add a "directness" requirement to § 1311, it must fight the statutory text to get there.

In addition, the majority fails to meaningfully distinguish Justice Scalia's concurrence in *Rapanos*, which made clear that the CWA applies to indirect pollution. It is true that *Rapanos* dealt with different facts. But it is irrelevant that the pollution in *Rapanos* traveled through point sources before reaching a navigable water, whereas the pollution in this case traveled through groundwater, which, according to the majority, is not a point source. In both cases, the legal issue is the same: whether the CWA applies to pollution that travels from a point source to navigable waters through a complex pathway. *See Rapanos*, 547 U.S. at 745 (asking whether "the contaminant-laden waters ultimately reach covered waters"). Indeed, Justice Scalia favorably cited the Second Circuit's discussion in *Concerned Area Residents for the Environment*. *Rapanos*, 547 U.S. at 744. In that case, pollutants traveled across fields—which "were not necessarily point sources themselves"—before reaching navigable waters. *Hawai'i Wildlife Fund*, 886 F.3d at 748. Given the Supreme Court plurality's endorsement of the Second Circuit's approach, the majority's attempt to distinguish *Rapanos* collapses.

Next, the majority warns that imposing liability would upset the cooperative federalism embodied by the CWA. On this view, the states alone are responsible for regulating pollution of groundwater, even if that pollution later travels to a navigable water. Wrong again. To be sure, the CWA recognizes the "primary responsibilities and rights of States" to regulate groundwater pollution. 33 U.S.C. § 1251(b). But imposing liability in this case would not marginalize the states. To the contrary, the district court made clear that it was *not* regulating the pollution of

groundwater itself. *See Tennessee Clean Water Network*, 273 F. Supp. 3d at 826 ("The Court agrees with those courts that view the issue not as whether the CWA regulates the discharge of pollutants into groundwater itself but rather whether the CWA regulates the discharge of pollutants to navigable waters via groundwater." (quotation marks, alteration, and citation omitted)). Instead, the district court was addressing pollution of a navigable water—specifically, the Cumberland River—via groundwater. This distinction was clear to the Fourth and Ninth Circuits. *See Upstate Forever*, 887 F.3d at 652 ("We do not hold that the CWA covers discharges to ground water itself. Instead, we hold only that an alleged discharge of pollutants, reaching navigable waters . . . by means of ground water with a direct hydrological connection to such navigable waters, falls within the scope of the CWA."); *Hawai'i Wildlife Fund*, 886 F.3d at 749 ("[T]he County's concessions conclusively establish that pollutants discharged from all four wells emerged at discrete points in the Pacific Ocean . . . . We leave for another day the task of determining when, if ever, the connection between a point source and a navigable water is too tenuous to support liability under the CWA."). Accordingly, imposing liability in this case fits perfectly with the CWA's stated purpose: to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

Finally, the majority offers a narrow reading of the CWA because, in its view, a more inclusive reading would render "virtually useless" the Coal Combustion Residuals ("CCR") Rule under the Resource Conservation and Recovery Act ("RCRA"). Maj. Op. at 13. The majority notes that if a polluter's conduct is regulated through a CWA permit, then RCRA does not also apply. The majority therefore suggests that a straightforward reading of the CWA is incompatible with RCRA. The majority would gut the former statute to save the latter.

But the EPA has already dismissed the majority's concern. Indeed, the EPA issued federal regulations on this issue many decades ago. The EPA's interpretation is that the industrial discharge of waste such as CCR is subject to regulation under both RCRA and the CWA: RCRA regulates the way polluters store CCR, and the CWA kicks in the moment CCR enters a navigable waterway. *See* 40 C.F.R. § 261.4(a)(2). The EPA first articulated this approach in a set of regulations from 1980, which provide that "[i]ndustrial wastewater discharges that are point source discharges subject to regulation under section 402 of the Clean Water Act" "are not solid wastes

for the purpose of" the RCRA exclusion.  40 C.F.R. § 261.4(a)(2).  This exclusion, the regulation explains, "applies only to the *actual point source discharge*.  It does not exclude industrial wastewaters while they are being collected, stored or treated before discharge, nor does it exclude sludges that are generated by industrial wastewater treatment."   § 261.4(a)(2) (comment) (emphasis added).  Thus, under the EPA's reading, a polluter can be liable under RCRA for improperly storing CCR—even if the CCR never enters a navigable waterway.  *See id.* Conversely, a polluter can be liable under the CWA for adding CCR to a navigable waterway— even if the polluter's storage methods comport with RCRA.  *See id.*  And of course, a polluter can be liable under both statutes if the polluter both improperly stores CCR and discharges it to a navigable waterway.  *See id.*

The EPA settled any doubts on this matter by publishing a detailed description of its rationale in the Federal Register.  *See* 45 Fed. Reg. 33098.  The EPA explained that 40 C.F.R. § 261.4(a)(2) reflects the EPA's interpretation that regulation of a polluter's discharge of industrial waste to a navigable waterway pursuant to the CWA does *not* trigger the 42 U.S.C. § 6903(27) exclusion and therefore does *not* exempt that polluter's storage of CCR from regulation under RCRA:

> The obvious purpose of the industrial point source discharge exclusion in Section 1004(27) was to avoid duplicative regulation of point source discharges under RCRA and the Clean Water Act.  Without such a provision, the discharge of wastewater into navigable waters would be "disposal" of solid waste, and potentially subject to regulation under both the Clean Water Act and Subtitle C [of RCRA].  These considerations do not apply to industrial wastewaters prior to discharge since most of the environmental hazards posed by wastewaters in treatment and holding facilities—primarily groundwater contamination—cannot be controlled under the Clean Water Act or other EPA statutes.
>
> Had Congress intended to exempt industrial wastewaters in storage and treatment facilities from all RCRA requirements, it seems unlikely that the House Report on RCRA would have cited, as justification for the development of a national hazardous waste management program, numerous damage incidents which appear to have involved leakage or overflow from industrial wastewater impoundments. *See, e.g.*, H.R. Rep. at 21.  Nor would Congress have used the term "discharge" in Section 1004(27).  This is a term of art under the Clean Water Act (Section 504(12)) and refers only to the "addition of any pollutant to navigable waters", not to industrial wastewaters prior to and during treatment.

> Since the comment period closed on EPA's regulations, both Houses of Congress have passed amendments to RCRA which are designed to provide EPA with more flexibility under Subtitle C in setting standards for and issuing permits to existing facilities which treat or store hazardous wastewater. *See* Section 3(a)(2) of H.R. 3994 and Section 7 of S.1156. *See also* S. Rep. No. 96-173, 96th Cong., 1st Sess. 3 (1979); Cong. Rec. S6819, June 4, 1979 (daily ed.); Cong. Rec. H1094–1096, February 20, 1980 (daily ed.). These proposed amendments and the accompanying legislative history should lay to rest any question of whether Congress intended industrial wastewaters in holding or treatment facilities to be regulated as "solid waste" under RCRA.

45 Fed. Reg. 33098. Congress ratified the EPA's interpretation when it enacted amendments to RCRA, which the EPA said would "lay to rest" any concerns about whether industrial wastes like CCR are subject to regulation under both RCRA (in terms of their storage and treatment) and the CWA (in terms of their discharge to navigable waters). *Id.*; *see* Public Law 96-482. From this history, and from the text of the statutes, we can surmise that Congress intended to delegate to the EPA the power "to speak with the force of law" on this aspect of the interplay between RCRA and the CWA. *See United States v. Mead Corp.*, 533 U.S. 218, 229 (2001). Exercising this authority, the EPA reached an interpretation that is different from—and incompatible with—that of the majority.

Contravening bedrock principles of administrative law, the majority bulldozes the EPA's interpretation of its own statutory authority without even discussing the possibility of deference. But "[w]e have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984).

> In *Chevron*, this Court held that ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion. Filling these gaps, the Court explained, involves difficult policy choices that agencies are better equipped to make than courts. 467 U.S., at 865–866, 104 S.Ct. 2778. If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation.

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005). The EPA says that imposing CWA liability for the discharge of CCR to navigable waterways does not eliminate the possibility of RCRA liability for the storage and treatment of CCR. The majority suggests the exact opposite. Unfortunately for the majority, but fortunately for those who enjoy clean water, the majority lacks the authority to override longstanding EPA regulations on a whim. *See id.*

For all these reasons, I believe the CWA clearly applies to the pollution in this case. Accordingly, I would join our sister circuits in holding that the CWA prohibits all pollution that reaches navigable waters "by means of ground water with a direct hydrological connection to such navigable waters[.]" *Upstate Forever*, 887 F.3d at 652; *see Hawai'i Wildlife Fund*, 886 F.3d at 745–49. Under this standard, the unpermitted leaks from NRS and Complex are clearly unlawful.

## II.      The Permit's Sanitary Sewer Overflow Provision

The permit prohibits "Sanitary Sewer Overflows," which it defines as "the discharge to land or water of wastes from any portion of the collection, transmission, or treatment system other than through permitted outfalls." (R. 1-2, permit, PageID# 79.) The district court found, and TVA no longer disputes, that the Complex discharges coal ash waste to groundwater through its unlined, leaking sides and bottoms. These discharges are not authorized by the permit. Therefore, Plaintiffs have proven a permit violation.

The majority avoids this result by overcomplicating the issue. Ignoring the plain text of the permit, the majority instead champions the EPA's standard definition of "Sanitary Sewer Overflow," which is narrow and arguably saves TVA from liability. This reasoning is perplexing. The EPA's definition should play no role in the legal analysis here because the permit itself defines "Sanitary Sewer Overflow." Indeed, TVA's permit expert conceded in the district court that the permit's definition is broader than the EPA's definition. Accordingly, this Court should apply the plain text of the permit's definition, as it would apply the plain text of any contract. This Court has no plausible authority or reason to substitute a definition provided in the permit with one drafted in a different context by a nonparty who has no relation to this case.

Further, the EPA's standard definition makes little sense in this context. As the majority recognizes, that definition applies only to sewage from sanitary sewer systems. But a coal ash pond is not a "sanitary sewer system." It does not contain "sewage." Consequently, interpreting the Sanitary Sewer Overflow provision to regulate sewage alone would render the provision meaningless. This Court should avoid such an interpretation, especially when the permit itself provides a definition that does not trigger any such concerns. *See Gallo v. Moen Inc.*, 813 F.3d 265, 273 (6th Cir. 2016) (noting the general rule that "courts should interpret contracts to avoid superfluous words").

For these reasons, I would hold that the district court correctly ruled that the Complex's karst-related leaks violate the sanitary-sewer provision.

## Conclusion

As set forth above, I believe that the CWA applies to TVA's indirect pollution of navigable waters and that TVA violated the permit's Sanitary Sewer Overflow provision. Because the majority disagrees as to both issues, I respectfully dissent.